[Cite as *Miami Trace Local School Dist. Bd. of Edn. v. Washington Court House City School Dist. Bd. of Edn.*, 2013-Ohio-3578.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| MIAMI TRACE LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, | : | |
| | : | CASE NO.  CA2013-01-001 |
| Plaintiff-Appellee, | : | |
| | : | O P I N I O N |
| - vs - | | 8/19/2013 |
| | : | |
| WASHINGTON COURT HOUSE CITY SCHOOL DISTRICT BOARD OF EDUCATION, | : | |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. 11CVH00130

Jeremy J. Neff and C. Bronston McCord, III, 1714 Galbraith Road, Cincinnati, Ohio 45239-4812, for plaintiff-appellee

John C. Albert, 500 South Front Street, Suite 1200, Columbus, Ohio 43215, for defendant-appellant

**S. POWELL, J.**

{¶ 1}  Defendant-appellant, Washington Court House City School District Board of Education, appeals from the judgment of the Fayette County Common Pleas Court awarding $94,213.36 to plaintiff-appellee, Miami Trace Local School District Board of Education, on its declaratory judgment/breach-of-contract action.  For the reasons that follow, we affirm the

trial court's judgment as modified herein.

{¶ 2} Prior to 1993, the Miami Trace School District (Miami Trace) and the Washington Court House School District (WCH) were frequently involved in litigation over numerous "territory" or land transfer requests made by persons who owned property within Miami Trace and wished to have it annexed into WCH. The land transfers had to be approved by the State Board of Education, and the board began to require that any land transfer request had to be discussed and negotiated between the school districts before any dispute was presented to it. The land transfer requests were generally approved in WCH's favor, after both school districts had incurred significant legal fees, costs and expenses in litigating the requested transfers.

{¶ 3} In an attempt to avoid the costs and contentiousness of this litigation, WCH's then-superintendent, Terry Feick, and Miami Trace's then-superintendent, Doug Male, reached an agreement in 1993 on a land transfer request regarding a 103.98 acre tract, known as "the Bailey Annexation," and a 232.26 acre tract, known as "the Ogan Annexation." Miami Trace agreed to transfer the Bailey and Ogan properties to WCH in exchange for WCH's agreeing to pay Miami Trace 30 percent of the "net tax gain generated by the transfers." The parties' 1993 agreement states in pertinent part:

> 2. Local taxes from the two properties shall be paid to the Washington C.H. City School District beginning January 1, 1994 for the 1993 tax duplicate year.
>
> 3. Thirty (30) percent of the net tax gain generated by the transfers shall be paid to the Miami Trace Local School District by the Washington C.H. City School District within thirty (30) days of receiving said monies.
>
> 4. Net tax gains shall be interpreted as the gross amount of tax collected, minus the State Foundation millage charge-off.

{¶ 4} In 1996, Miami Trace and WCH entered into a similar agreement on a land transfer request involving an 18.483-acre tract belonging to Dick R. Junk and Carolyn D.

- 2 -

Junk. The parties used their 1993 agreement as a template for drafting their 1996 agreement, but they modified the language of the 1993 agreement by inserting the words "and thereafter" at the end of paragraph two and "every year" at the end of paragraph three of the agreement.

{¶ 5} In March 2001, the parties entered into a similar agreement on a requested land transfer involving a 1.0616-acre tract, known as the Fairway Condominium Tract. The parties' March 2001 agreement eliminated the second paragraph of the parties' 1993 and 1996 agreements that contained the term "local taxes[,]" and thus states in pertinent part:

> Thirty percent (30%) of the "net tax gain" generated by the transfer shall be paid to the Miami Trace Local School District by the Washington Court House City School District within thirty (30) days of receiving said moneys every year. "Net tax gain" shall be interpreted as the gross amount of taxes collected, minus the state foundation millage charge-off.

{¶ 6} In September 2001, the parties entered into a fourth land transfer agreement involving a 6.7665-acre tract, known as the "Deerfield Subdivision Tract." This agreement closely follows the language of the parties' March 2001 agreement.

{¶ 7} At the time the parties entered their agreements, WCH only had an operating levy; it did not have a permanent improvement levy and had not passed a bond issue. After the last of the four agreements between the parties was reached in September 2001, WCH passed its first permanent improvement levy in 2002 and its first bond issue in 2005. WCH has never made a payment to Miami Trace under any of the four agreements.

{¶ 8} In 2010, Miami Trace, while working on an unrelated land transfer request, reviewed the four land transfer agreements with WCH and concluded that WCH owed a substantial amount of money under the terms of those agreements. Miami Trace arrived at this conclusion by interpreting the parties' agreements to mean that the 30-percent-payment provision in the parties' four agreements applies to the funds WCH receives from its

permanent levy and bond issue, as well as its operating levy. However, when Miami Trace sought payment from WCH for these amounts, WCH refused on the ground that the 30-percent-payment provision applies only to the funds it receives from its operating levy.

{¶ 9} In 2011, Miami Trace brought a declaratory judgment/breach-of-contract action against WCH. Following discovery, the case was submitted on the parties' "Joint Stipulations of Fact" in which the parties stipulated that (1) they "are in disagreement over the intent, interpretation, application and calculation of the thirty percent (30%) payment set forth in the four agreements," and (2) "[i]f Miami Trace prevails in this matter the total amount due [it] * * * is $94,213.36[,]" while "[i]f Washington Court House prevails in this matter the total amount due [Miami Trace] * * * is $5,839.42."

{¶ 10} In 2012, the trial court found that Miami Trace was entitled to prevail, and awarded $94,213.36, because "[t]he clear and unambiguous language of all four agreements is that 'gross amount of taxes collected' includes operating levies, permanent levies and bond issues."

{¶ 11} WCH now appeals the trial court's judgment and assigns the following as error:

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT ERRED IN FAILING TO ASCERTAIN AND GIVE EFFECT TO THE INTENT OF THE PARTIES.

{¶ 14} Assignment of Error No. 2:

{¶ 15} THE TRIAL COURT ERRED IN FINDING THE LANGUAGE OF THE FOUR (4) AGREEMENTS WAS CLEAR AND UNAMBIGUOUS AND SHOULD HAVE CONSIDERED EXTRINSIC EVIDENCE.

{¶ 16} Assignment of Error No. 3:

{¶ 17} THE TRIAL COURT'S DECISION RESULTS IN MANIFEST ABSURDITY AND IS CONTRARY TO THE MEANING OF THE CONTRACTS.

{¶ 18} In its first assignment of error, WCH argues the trial court erred in finding that the parties intended for the 30-percent-payment provision in their agreements to apply to the funds WCH receives from its permanent improvement levy and bond issue as well as its operating levy. We agree with this argument.

{¶ 19} "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). "The intent of the parties to a contract is presumed to reside in the language they choose to employ in the agreement." *Id.* "'[C]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall contents of the instrument[.]'" *Id.* In construing an agreement, a court "must attempt to give effect to each and every part of [the agreement] * * * and avoid any interpretation of one part which will annul another part." *Foster Wheeler Enviresponse, Inc.* at 362-363. The parties' unexpressed intentions are not enforceable. *Id.*

{¶ 20} In the present case, there are two provisions in the parties' agreements that lead us to conclude that the parties intended for the 30-percent-payment provision to apply to the funds WCH receives from its operating levy but not to those it receives from its permanent improvement levy or bond issue. The first is the "state foundation millage charge off" provision contained in paragraph four of the parties' 1993 and 1996 agreements and carried over into their 2001 agreements.

{¶ 21} As Miami Trace explains in its appellate brief,

> the [state foundation millage] charge-off is a minimum rate of taxation that the Ohio Department of Education assumes each district is levying for its local share of funding, and therefore the revenue that would be generated at the charge-off rate is subtracted from the payments made by the ODE to districts. If a district does not levy taxes at or above the charge-off rate it effectively loses money.

*See also*, Kimball H. Carey, *Ohio School Law Guide*, Sections 5.40-5.42, 487-493 (Ed.2013) (discussing the school foundation program, including the concept of "charge-off").

**{¶ 22}** Miami Trace's treasurer, Deb Black, acknowledged in her deposition that the state foundation millage charge-off provision only applies to operating funds and not to permanent improvement or bond levies:

> Q.　　Is it true that neither the permanent improvement funds nor the bond funds, any dollars generated by the bond fund or bond levy, is subject to the State Foundation millage charge-off?
>
> A.　　As far as state funding, sir?
>
> Q.　　Yes.
>
> A.　　Correct.

**{¶ 23}** The second provision in the agreements that leads us to conclude that the parties intended for the 30-percent-payment provision to apply only to the funds WCH receives from its operating levy is the one that includes the words "generated by the transfer." This provision is contained in the third paragraph of the parties' 1993 and 1996 agreements and was carried over into their two 2001 agreements. The provision states that "30 percent of the net tax gain *generated by the transfer* shall be paid to [Miami Trace by WCH][.]" (Emphasis added.) Thus, the language of the parties' agreements expressly limits the term "net tax gain" to those net tax gains "*generated by the transfer.*" (Emphasis added.)

**{¶ 24}** Miami Trace notes that the agreements define "net tax gain" as "the gross amount of taxes collected, minus the state foundation charge off." Miami Trace then points out that the common definition of "gross" is "total," and asserts that, therefore, the term "gross amount of taxes" should be interpreted to include the funds WCH receives from its permanent improvement levy and bond issue, as well as its operating levy. However, Miami Trace's argument ignores the agreements' phrase "generated by the transfers," and the fact

that the new permanent improvement levy and new bond issue did not exist as taxes they were collecting at the time of the transfers.

{¶ 25} The spirit of these agreements is to compensate Miami Trace for any "lost tax revenue" "generated by the transfers." The parties' four agreements expressly limit the term "net tax gain" to those that are "generated by the transfers" in question. However, Miami Trace could not have any "lost tax revenue" "generated by the transfers" from taxes that did not exist at the time of the agreements. WCH's permanent improvement levy and bond issue do not fall within the term "gross amount of taxes collected" because the permanent improvement levy and bond issue did not exist when these agreements were executed. The four land transfers in question were completed in 1993, 1996 and two more in 2001. WCH's permanent improvement levy was not passed until 2002 and its bond issue was not passed until 2005.

{¶ 26} In light of the foregoing, the first assignment of error is sustained to the extent the trial court erred in determining that the 30-percent-payment provision applies to WCH's subsequently enacted permanent improvement levy and bond issue. We therefore modify the trial court's judgment by reducing the award granted to Miami Trace from $94,213.36 to $5,839.42. The judgment of the trial court is, in all other respects, affirmed as modified.[1]

RINGLAND, P.J., and PIPER, J., concur.

---

1. We need not decide WCH's 2nd and 3rd assignments of error since they have been rendered moot by our disposition of the first assignment of error.