[Cite as *Beachwood City School Dist. Bd. of Edn. v. Warrensville Hts. City School Dist. Bd. of Edn.*, 2020-Ohio-4459.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

BEACHWOOD CITY SCHOOL DISTRICT
BD. OF EDUCATION,

        Plaintiff-Appellant,

        v.

WARRENSVILLE HEIGHTS CITY
SCHOOL DISTRICT BD. OF
EDUCATION,

        Defendant-Appellee.

No. 108253

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 17, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-902080

---

## *Appearances:*

Brindza, McIntyre & Seed, L.L.P., Daniel M. McIntyre, and David A. Rose; and Reminger Co., L.P.A., Holly Marie Wilson, and Aaren R. Host, *for appellant.*

Pepple & Waggoner, Ltd., Christian M. Williams, Donna M. Andrew, and Brian J. DeSantis; and Taft, Stettinius & Hollister, L.L.P., Thomas J. Lee, Adrian D. Thompson, and Josh M. Mandel, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} At the heart of this case are two 1997 agreements between plaintiff-appellant, Beachwood City School District Board of Education ("Beachwood"), and defendant-appellee, Warrensville Heights City School District Board of Education ("Warrensville Heights"). The agreements provide that the school districts would share the tax revenue from a 405-acre tract of land known as the Chagrin Highlands (the "Chagrin Land") that the city of Beachwood annexed from the city of Cleveland in 1990. Despite the disparity between the school districts and the resulting optics in which these agreements were developed and executed, the issue before us in this appeal is limited to whether the agreements that the parties spent years negotiating are valid and enforceable.

{¶ 2} Beachwood raises one assignment of error, that "the trial court erred in granting summary judgment in favor of" Warrensville Heights. Beachwood identifies three issues under its sole assignment of error: (1) whether the parties' agreements are valid without approval from the Ohio Board of Education; (2) whether their agreements are valid without fiscal certificates; and (3) whether Warrensville Heights is immune from Beachwood's tort claims.

{¶ 3} We find merit to Beachwood's sole assignment of error and hold that the 1997 agreements are valid and enforceable. We therefore reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## I.  Procedural History and Factual Background

{¶ 4}  In August 2018, Beachwood filed a complaint against Warrensville Heights for promissory estoppel, unjust enrichment, conversion, fraud, and two counts of breach of contract.  Beachwood sought monetary damages, a declaratory judgment that the 1997 agreements between the parties are valid, and a permanent injunction to enforce the agreements.  Beachwood attached the two agreements as exhibits to the complaint.

{¶ 5}  In October 2018, Warrensville Heights moved to dismiss Beachwood's complaint, arguing that Warrensville Heights is statutorily immune from claims for promissory estoppel, unjust enrichment, conversion, and fraud. Warrensville Heights further maintained that Beachwood did not allege facts showing that the agreements ever became valid and enforceable.  Beachwood filed an opposition, and the trial court denied Warrensville Heights' motion to dismiss.

{¶ 6}  In November 2018, Warrensville Heights answered Beachwood's complaint and filed a counterclaim against Beachwood for specific performance. The counterclaim alleged that the agreements were invalid, but if the trial court found otherwise, Warrensville Heights sought an order directing Beachwood to comply with its obligation under the agreements to engage in joint educational programs.  Beachwood filed an answer, and the parties engaged in discovery.

{¶ 7}  In December 2018, Warrensville Heights filed a motion for summary judgment, and Beachwood filed an opposition.  The following facts come from the deposition transcripts and the opposing summary-judgment motions.

**{¶ 8}** Both Beachwood and Warrensville Heights are political subdivisions under Chapter 2744 of the Ohio Revised Code and are public school districts organized and operating under the laws of the state of Ohio within Cuyahoga County.

**{¶ 9}** In March 1990, the city of Beachwood annexed the Chagrin Land from the city of Cleveland. Both parties agree that despite the municipal annexation, the Chagrin Land remained within the Warrensville Heights City School District.[1]

**{¶ 10}** In October 1990, Beachwood requested that the Ohio Department of Education transfer the Chagrin Land for school-district purposes from Warrensville Heights to Beachwood pursuant to R.C. 3311.06. Warrensville Heights opposed the request. An Ohio Department of Education representative instructed Beachwood that it must negotiate in good faith with Warrensville Heights pursuant to Ohio Adm.Code Chapter 3301-89 to try to reach an agreement in the best interest of the districts' educational programs. Warrensville Heights and Beachwood attempted, unsuccessfully, to resolve the dispute. In 1993, the Ohio Department of Education provided Warrensville Heights and Beachwood with names of potential mediators who had backgrounds in public education. The parties disagreed on which of the

---

[1] School districts and municipalities are separate political subdivisions of the state of Ohio. Although a city school district generally consists of territory within the limits of each municipality, the school district boundaries need not coincide with the territorial limits of the municipality. 1 Anderson, *Ohio School Law Guide*, Section 2.04 (2020). "Annexation" means "annexation for municipal purposes." R.C. 3311.06(A)(1). When a municipality annexes territory of an adjoining municipality, the territory is not automatically transferred to the school district of the annexing municipality unless the territory comprises an entire school district. 1 Anderson, *Ohio School Law Guide*, Section 2.22 (2020).

mediators to select.  In 1995, the parties asked the Ohio Department of Education to approve a "mediation conducted locally by a mutually acceptable facilitator" because the parties were unclear whether such action would comply with Ohio Adm.Code Chapter 3301-89.  The Ohio Department of Education's response is not in the record, but in May 1996, the parties agreed to use former U.S. District Judge Robert M. Duncan ("Duncan") to facilitate the matter.

{¶ 11} The parties met with Duncan to mediate a resolution in November 1996 and January 1997.  On April 8, 1997, Duncan issued a memorandum with respect to the "request of the Beachwood City School District for transfer of territory from the Warrensville Heights City School District."  In his memorandum, he stated:

> The property, which is a 405-acre tract formerly owned by the City of Cleveland, but within Warrensville Heights City School District, was annexed to the City of Beachwood on March 20, 1990.  In October 1990, the Beachwood City School District Board of Education authorized action to obtain the transfer of the property to the Beachwood District pursuant to R.C. 3311.06.  The Warrensville Heights District has firmly and consistently opposed the transfer.  All attempted efforts to settle the transfer issue have failed.

{¶ 12} Duncan then set forth the following recommendations:

1. It was agreed that the property will remain in the Warrensville Heights City School District.

2. Warrensville Heights proposed that real estate tax revenues from the property, generated from that amount of market value of the property (as determined by the Auditor) which exceeds the current amount of $22,258,310 should be shared by the parties.  * * *

   a. It was agreed that Warrensville Heights shall receive 100% of tax revenue generated by portions of the property classified as residential or agricultural.

b. If no abatement of real estate taxes is granted, Warrensville Heights proposed that it should receive 70% and Beachwood should receive 30% of tax revenue generated by the portions of the property classified other than as residential or agricultural. Beachwood proposed the portions of 60% to Warrensville Heights and 40% to itself. * * * I indicated my view that the Warrensville Heights proposal was more equitable.

c. If abatement of real estate taxes is granted, Warrensville Heights proposed a graduated scale of percentage change in its favor, ranging to 100% abatement. Beachwood proposed that the scale should only vary up to 25% abatement, since any percentage in excess of that amount would require the approval of Warrensville Heights. Consensus was reached that the scale should only vary to 25% and above, as follows:

* * *

3. It was agreed that the parties shall mutually engage in joint educational programs and activities, including but not limited to those programs and activities discussed previously.

Duncan concluded his memorandum by "strongly urg[ing] both Boards of Education to act favorably on the recommendations."

{¶ 13} In April 1997, the Ohio Department of Education asked the school districts for a status update, and they responded that they had received Duncan's recommendation and were in the process of preparing "a formal agreement between the parties."

{¶ 14} In May 1997, both school boards voted to adopt Duncan's recommendations.

{¶ 15} On May 12, 1997, Beachwood and Warrensville Heights entered into an agreement, which incorporated Duncan's recommendations and stated in relevant part:

> WHEREAS, certain territory in the Warrensville Heights City School District has been annexed for municipal purposes to the City of Beachwood ("the Territory") * * *; and
>
> WHEREAS, Beachwood has requested the Ohio Board of Education to transfer the Territory to the Beachwood School District, pursuant to Section 3311.06(C)(2) of the Ohio Revised Code, which request remains pending; and
>
> * * *
>
> WHEREAS, an agreement incorporating Judge Duncan's recommendations will permit the Territory to remain in Warrensville Heights, with a sharing of tax revenues between the two School Districts on a basis of 70% to Warrensville Heights and 30% to Beachwood which will provide Beachwood with the equivalent of approximately 50% of the revenue which it would have received if the Territory were transferred to Beachwood and other cooperation of educational benefit to both School Districts[.]

{¶ 16} The agreement then stated:

[T]he parties do hereby agree as follows:

1. Beachwood shall withdraw its request to transfer the Territory and shall not institute any further such request.

2. Real estate tax revenues from that amount of market value of the Territory (as determined by the Cuyahoga County Auditor) which exceeds the amount of $22,258,310 (the "Base Amount") shall be shared by the parties as set forth below.

   a. Warrensville Heights shall receive 100% of real estate tax revenue generated by portions of the Territory classified as residential or agricultural.

     b. If no abatement of real estate taxes is granted, Warrensville Heights shall receive 70% and Beachwood shall receive 30% of real estate tax revenue generated by the portions of the Territory classified other than as residential or agricultural, net revenues from the Base Amount.

     c. If abatement of real estate taxes is granted, the parties shall receive the respective percentages set forth below * * *

3. The parties shall mutually engage in joint educational programs and activities which will be of benefit to both School Districts. The activities and programs contemplated include student exchanges, shared field trips, joint staff development activities and distance learning technology programs. The enumeration of specific types of programs is illustrative and not intended to limit the cooperative interaction and exchanges of students, staff and resources. These programs and services will be reviewed annually by the staff and a report given to each Board of Education.

* * *

The superintendent, treasurer, and board president of both school districts signed the agreement.[2]

{¶ 17} On July 2, 1998, the Ohio Department of Education requested a status update from the school districts. The parties' response is not in the record. On July 8, 1998, Beachwood withdrew its request to transfer the Chagrin Land from the Ohio Department of Education.

{¶ 18} Beachwood's treasurer, who has been the treasurer since 1989, testified at her deposition that she monitored the real estate value of the Chagrin Land throughout the decades as best she could. She explained that every time

---

[2] The parties treat Duncan's adopted memorandum and the May 12, 1997 agreement as two separate agreements (or purported agreements). Throughout the rest of this opinion, we will refer to Duncan's adopted memorandum and the May 12, 1997 agreement collectively as the "agreements."

Warrensville Heights had a new treasurer, she would reach out to the treasurer and inform him or her of the May 12, 1997 agreement.

{¶ 19} In 2013, the Chagrin Land's value reached the $22,258,310 threshold set forth in the agreements. Representatives from the school districts met several times between 2013 and 2016 to discuss the implementation of revenue sharing and joint educational programming. The school districts participated in joint educational programming in the 2013-2014 and the 2016-2017 school years. Warrensville Heights, however, refused to pay Beachwood the amounts that Beachwood claimed it was due under the agreements.

{¶ 20} In its motion for summary judgment, Warrensville Heights argued that it was entitled to judgment as a matter of law on Beachwood's claims because (1) the Ohio Board of Education did not approve the agreements as R.C. 3311.06 required, (2) the agreements did not contain the fiscal certificates pursuant to R.C. 5705.41 and 5705.412, and (3) Warrensville Heights is statutorily immune from claims of promissory estoppel, unjust enrichment, conversion, and fraud, and these claims also fail because the Ohio Board of Education did not approve the agreements. Beachwood countered each of Warrensville Heights' arguments.

{¶ 21} On February 6, 2019, the trial court granted Warrensville Heights' motion for summary judgment with a written opinion. The opinion reviewed the language set forth in R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89, and stated in relevant part:

Though [Beachwood's] petition for transfer of territory pended with the State Board for years, the parties failed to complete the required steps needed to finalize an agreement pursuant to ORC 3311.06.

An extensive statutory scheme existed specifically for resolving inter-district territorial and funding disputes, and the court finds the parties were without the capacity to contract over the transfer of tax dollars, purported by Plaintiff to be over five million dollars, without the approval of the State Board of Education.

Because the parties were without the authority to contract absent the final approval of the State Board, the court finds no valid contract was formed and [Beachwood's] remaining counts for promissory estoppel, unjust enrichment, conversion, and fraud fail.

{¶ 22} Beachwood timely appeals from the trial court's February 6, 2019 judgment.

## II. Summary Judgment Standard

{¶ 23} We review an appeal from summary judgment under a de novo standard. *Baiko v. Mays*, 140 Ohio App.3d 1, 10, 746 N.E.2d 618 (8th Dist.2000). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997). Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine:

(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party.

*State ex rel. Duganitz v. Ohio Adult Parole Auth.*, 77 Ohio St.3d 190, 191, 672 N.E.2d 654 (1996).

**{¶ 24}** Civ.R. 56(C) also provides an exclusive list of materials that parties may use to support a motion for summary judgment:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule.

**{¶ 25}** The moving party carries an initial burden of setting forth specific facts that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the movant fails to meet this burden, summary judgment is not appropriate, but if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. *Id.* at 293.

## III. Approval by the Ohio Board of Education

**{¶ 26}** Beachwood first argues that the trial court erred in "permitting Warrensville [Heights] to avoid its contractual settlement obligations" and granting Warrensville Heights summary judgment on its breach-of-contract claims because there "remains a genuine dispute of fact as to whether Warrensville [Heights] breached" the agreements. Beachwood argues that both parties were free to enter into the agreements and were not restricted by or required to obtain approval from the Ohio Board of Education. Beachwood further maintains that the trial court improperly interpreted R.C. 3311.06 to include a "penalty of automatic invalidation" for agreements not approved by the Ohio Board of Education.

{¶ 27} Warrensville Heights does not contest the terms of the agreements. Instead, it argues that no contract exists between the parties because the Ohio Board of Education did not review or approve the agreements as the statutory schemes set forth in R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89 required. Warrensville Heights contends that the agreements were to share tax revenue, which is part of the "bundle of rights" that comes with the transfer of territory, and the only type of agreements that do not require Ohio Board of Education approval are those involving urban school districts. Warrensville Heights maintains that the agreements resulted from Beachwood's request to transfer the Chagrin Land and subsequent negotiations pursuant to R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89, and approval from the Ohio Board of Education was therefore required even though the Chagrin Land was not actually transferred. Warrensville Heights further contends that if the agreements did not require approval from the Ohio Board of Education, they would circumvent the statutory schemes set forth in R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89 and would be contrary to the legislative intent. Warrensville Heights also implies that the agreements are not enforceable because they resulted from an improper "tax grab" by Beachwood. As a result, Warrensville Heights argues the agreements are not enforceable, and summary judgment was therefore appropriate.

{¶ 28} "School boards are creations of statute and have no more authority than what has been conferred on them by statute or what is clearly implied

therefrom." *Wolf v. Cuyahoga Falls City School Dist. Bd. of Edn.*, 52 Ohio St.3d 222, 223, 556 N.E.2d 511 (1990).

{¶ 29} The Ohio Revised Code explicitly provides that a board of education has the power to contract. R.C. 3313.17 states:

> The board of education of each school district shall be a body politic and corporate, and, as such, capable of suing and being sued, contracting and being contracted with, acquiring, holding, possessing, and disposing of real and personal property, and taking and holding in trust for the use and benefit of such district, any grant or devise of land and any donation or bequest of money or other personal property.

Therefore, Beachwood and Warrensville Heights had the power to contract with one another. Additionally, R.C. 3313.33 provides in pertinent part that "[n]o contract shall be binding upon any board unless it is made or authorized at a regular or special meeting of such board." There is no dispute that Beachwood and Warrensville Heights voted to adopt both Duncan's recommendation and the May 12, 1997 agreement.

{¶ 30} Nevertheless, "in Ohio, political subdivisions cannot be bound by contract unless the agreement is in writing and formally ratified through proper channels." *Schmitt v. Educational Serv. Ctr.*, 2012-Ohio-2208, 970 N.E.2d 1187, ¶ 18 (8th Dist.). Beachwood argues that the "proper channels" were for both boards of education to ratify the agreements. Warrensville Heights argues that the "proper channels" were to have the boards approve the agreements and have the Ohio Board of Education approve the agreements pursuant to R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89. An examination of those provisions is necessary.

{¶ 31} A court's main objective when interpreting a statute is to determine and give effect to the legislative intent. *State ex rel. Solomon v. Bd. of Trustees of the Police & Firemen's Disability & Pension Fund*, 72 Ohio St.3d 62, 65, 647 N.E.2d 486 (1995). We first look to the language of the statute itself to determine the intent of the General Assembly. *Stewart v. Trumbull Cty. Bd. of Elections*, 34 Ohio St.2d 129, 130, 296 N.E.2d 676 (1973). When a statute's meaning is clear and unambiguous, we apply the statute as written. *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105-106, 304 N.E.2d 378 (1973).

{¶ 32} R.C. 3311.06, titled "Territory of district to be contiguous; exceptions; procedure upon annexation," states (and stated in 1997) in pertinent part:

> (C)(2) When the territory so annexed to a city or village comprises part but not all of the territory of a school district, the said territory becomes part of the city school district or the school district of which the village is a part only upon approval by the state board of education, unless the district in which the territory is located is a party to an annexation agreement with the city school district.
>
> * * *
>
> Any school district, except an urban school district,[3] desiring state board approval of a transfer under this division shall make a good faith effort to negotiate the terms of transfer with any other school district whose territory would be affected by the transfer. Before the state board may approve any transfer of territory to a school district, except an urban school district, under this section, it must receive the following:

---

[3] An "urban school district" is "a city school district with an average daily membership for the 1985-1986 school year in excess of twenty thousand that is the school district of a city that contains annexed territory." R.C. 3311.06(A)(3). The parties agree that neither is an urban school district.

(a) A resolution requesting approval of the transfer, passed by at least one of the school districts whose territory would be affected by the transfer;

(b) Evidence determined to be sufficient by the state board to show that good faith negotiations have taken place or that the district requesting the transfer has made a good faith effort to hold such negotiations;

(c) If any negotiations took place, a statement signed by all boards that participated in the negotiations, listing the terms agreed on and the points on which no agreement could be reached.

(D) The state board of education shall adopt rules governing negotiations held by any school district except an urban school district pursuant to division (C)(2) of this section. The rules shall encourage the realization of the following goals:

(1) A discussion by the negotiating districts of the present and future educational needs of the pupils in each district;

(2) The educational, financial, and territorial stability of each district affected by the transfer;

(3) The assurance of appropriate educational programs, services, and opportunities for all the pupils in each participating district, and adequate planning for the facilities needed to provide these programs, services, and opportunities.

Districts involved in negotiations under such rules may agree to share revenues from the property included in the territory to be transferred, establish cooperative programs between the participating districts, and establish mechanisms for the settlement of any future boundary disputes.

* * *

(G) In the event territory is transferred from one school district to another under this section, an equitable division of the funds and indebtedness between the districts involved shall be made under the supervision of the state board of education and that board's decision shall be final. * * *

* * *

(I) No transfer of school district territory or division of funds and indebtedness incident thereto, pursuant to the annexation of territory to a city or village shall be completed in any other manner than that prescribed by this section regardless of the date of the commencement of such annexation proceedings, and this section applies to all proceedings for such transfers and divisions of funds and indebtedness pending or commenced on or after October 2, 1959.

{¶ 33} Simply put, R.C. 3311.06 applies to agreements that transfer territory from one school district to another. *See Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 26. R.C. 3311.06(C)(2) requires approval from the state board of education for territory annexed by a municipality to "become[] part of the city school district[.]" Although R.C. 3311.06(D) provides that "[d]istricts involved in negotiations under [Ohio Adm.Code Chapter 3301-89] may agree to share revenues from the property" and "establish cooperative programs between the participating districts," this subsection is limited to "the territory to be transferred." Similarly, R.C. 3311.06(I) provides that the statute applies to the "transfer of school district territory or division of funds and indebtedness incident thereto[.]" Pursuant to the plain language of the statute, a revenue-sharing agreement without an actual transfer of territory does not require approval from the Ohio Board of Education.

{¶ 34} Contrary to Beachwood's argument that R.C. 3311.06 does not contain a "penalty of automatic invalidation," the statute and case law make clear that territory transfers pursuant to the statute are not valid unless they have approval from the Ohio Board of Education. R.C. 3311.06(C)(2) ("[T]he said territory becomes part of the city school district * * * only upon approval by the state

board of education[.]"); *State ex rel. Bd. of Edn. v. Bd. of Edn.*, 172 Ohio St. 237, 242, 175 N.E.2d 91 (1961) ("In the absence of the necessary definite approval, the [territory] transfer was not completed[.]"). However, here, the agreements are clear that no transfer of territory was to occur, and the Ohio Board of Education did not need to approve them.

{¶ 35} Warrensville Heights argues that approval from the Ohio Board of Education was required despite the lack of territory transfer because the agreements were "developed" from Beachwood's request to transfer the Chagrin Land and subsequent negotiations pursuant to R.C. 3311.06. However, the agreements explicitly required Beachwood to "withdraw its request to transfer the [t]erritory and [to] not institute any further such request." The agreements stated that instead of transferring the Chagrin Land, the Chagrin Land would remain in Warrensville Heights, and Beachwood and Warrensville Heights would share the real estate taxes generated from the Chagrin Land upon its value reaching a set amount. Pursuant to the agreements, Beachwood withdrew its request to transfer the Chagrin Land. Nothing in the record shows that the Ohio Department of Education rejected this withdrawal or requested any further action of either party. The parties in this case agreed to not transfer the Chagrin Land, and the revenue that the parties agreed to share could not be "incident to" a transfer of territory. Therefore, R.C. 3311.06 does not apply.

{¶ 36} This interpretation of R.C. 3311.06 is consistent with its legislative intent and history. Although the Ohio Board of Education is charged generally with

supervising the public education system pursuant to R.C. 3301.07, the Ohio Supreme Court has recognized that the purpose of R.C. 3311.06, in particular, is to provide stable school district boundaries to help give certainty to families and school officials:

> In R.C. 3311.061, the General Assembly expressly stated the legislative intent underlying 1986 amendments to R.C. 3311.06. The first paragraph of R.C. 3311.061 recognizes that school district boundaries are a matter of great concern to the public, that state law has generated substantial uncertainty over the stability of school district boundaries, and that this uncertainty has been particularly stressful for families with school-age children and has hindered the ability of school officials to plan for the future. The first paragraph concludes that a fair and lasting solution "can best be achieved through a cooperative effort involving school district officials, board of education members, and legislators."

*Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, at ¶ 28. The legislature intended to provide stability related to the physical school district boundaries. Requiring Ohio Board of Education approval for only agreements that affect the physical school district boundaries is consistent with this purpose.

{¶ 37} Warrensville Heights argues that we must construe R.C. 3311.06(I) broadly to include all the "bundle of rights" that come with the transfer of territory. It maintains that tax revenue is part of the bundle of rights, and that the sharing of tax revenue is therefore equivalent to the transfer of territory. But the plain language of R.C. 3311.06 is not consistent with this argument. The statute provides that the territory of a school district should be "contiguous" and is specifically concerned with the "boundaries" — the physical aspects of territory. R.C. 3311.06(I) also distinguishes between the transfer of territory and "the division of funds and

indebtedness incident thereto."  We therefore decline to interpret the transfer of territory to mean the sharing of tax revenue separate from the transfer of physical territory.

{¶ 38} Warrensville Heights further maintains that when reading R.C. 3311.06 as a whole, it is "abundantly clear" that there is "only one specific class of agreements that do not require approval by the Ohio Board of Education" — those involving an "urban school district."  This may be true for agreements to transfer territory.  But based on the plain language of R.C. 3311.06(D)(3), revenue-sharing agreements that are not incident to a transfer of territory also do not need approval from the Ohio Board of Education.  As a result, the trial court erred in concluding that R.C. 3311.06 required Beachwood and Warrensville Heights to acquire the state board of education's approval to make the agreements enforceable.

{¶ 39} We next turn to Ohio Adm.Code Chapter 3301-89, titled, "Transfers of Territory."  Ohio Adm.Code 3301-89-01, titled, "General policies of the state board of education in a request for transfer of territory under [R.C.] 3311.06 or 3311.24," is the same today as it was in 1997.  It states:

> (A) The rules under Chapter 3301-89 of the Administrative Code apply to the request for a transfer of territory following municipal annexation under section 3311.06 of the Revised Code.
>
> * * *
>
> (C) The department of education shall require the boards of education affected by a request for transfer of territory to enter into good faith negotiations when it is required by sections 3311.06 and 3311.24 of the Revised Code.

(D) In situations where agreement has been reached between respective boards of education, the terms of agreement should be sent to the state board of education with reasonable dispatch. * * *

{¶ 40} The 1997 version of Ohio Adm.Code 3301-89-02, titled "Procedures of the state board of education in a request for transfer of territory under section 3311.06 * * * of the Revised Code," stated in pertinent part:

(A) Initial requests

(1) A school district may request a transfer of certain territory for school purposes under section 3311.06 of the Revised Code by sending an initial letter requesting the land transfer to the state board of education[.]

* * *

(6) Upon receipt of a negotiated agreement, the state board of education shall adopt a resolution of approval of the negotiated agreement or may establish a hearing if approval is not granted.

{¶ 41} The 1997 version of Ohio Adm.Code 3301-89-04, titled "Procedures governing negotiations of school districts, other than urban school districts as defined in division (A)(3) of section 3311.06 of the Revised Code," stated in pertinent part:

(A) Negotiation Process

* * *

(7) Agreements reached shall be adopted by each board of education involved. A copy of the resolution and the negotiated agreement shall be transmitted by each board of education to the state board of education.

* * *

(C) The following are examples of terms that school districts may agree to:

(1) Share revenues from the property included in the territory to be transferred;

(2) Establish cooperative programs between the participating districts;

(3) Establish mechanisms for the settlement of any future boundary disputes; and

(4) No tax revenue to the receiving district from the territory transferred for a period of time.

(D) Before the state board of education may hold a hearing on a transfer, or approve or disapprove any such transfer, it must receive the following items:

(1) A resolution requesting approval of the transfer, passed by at least one of the school districts whose territory would be affected by the transfer, if the transfer request is pursuant to section 3311.06 of the Revised Code[.]

* * *

{¶ 42} Like R.C. 3311.06, Ohio Adm.Code Chapter 3301-89 applies to the transfer of territory between school districts.  Although Ohio Adm.Code 3301-89-02(A)(3) provides that "upon receipt of a negotiated agreement, the state board of education shall determine whether to approve the agreement," this section concerns requests and negotiated agreements for "a transfer of certain territory," "concerning a transfer of territory," and "the proposed transfer."  Ohio Adm.Code 3301-89-04(A)(7) provides that "agreements" adopted by the parties need to be submitted to the state board of education with a resolution for approval.  Although this subsection does not identify the type of agreement, subsection (C)(1) includes language referring to the "territory to be transferred."  Moreover, Ohio Adm.Code Chapter

3301-89 was promulgated pursuant to R.C. 3311.06 and 3311.24, which both pertain to the transfer of territory.

{¶ 43} Warrensville Heights argues that following Beachwood's interpretation of R.C. 3311.06 and the pertinent sections of the Ohio Adm.Code — i.e., that the provisions do not apply because there was not a transfer of territory — would allow school districts to circumvent the entire statutory schemes set forth in those sections and would render those sections meaningless. Specifically, Warrensville Heights states that "Beachwood's novel rule would undermine the entire comprehensive statutory scheme that has been in place for decades." But the plain language of R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89 do not require the Ohio Board of Education's approval when there is not a transfer of territory. Beachwood did not circumvent the statutory scheme — it was simply not required to follow it.

{¶ 44} Lastly, Warrensville Heights' characterization of Beachwood's transfer request as a "tax grab" is irrelevant for the purposes of this appeal. Its citation to a newspaper article and statistical information suggesting that the transfer request was inequitable would be relevant to the Ohio Board of Education's determination of whether to approve a request for a transfer of territory. *See* Ohio Adm.Code 3301-89-02(D) (enumerating questions for the state board of education to consider). It also undoubtedly influenced the years-long negotiations and mediation that resulted in the subject agreements: that unabated real estate tax revenue generated from the amount of market value of the Chagrin Land that

exceeded $22,258,310 would be shared 30 percent to Beachwood and 70 percent to Warrensville Heights. But the "tax grab" characterization has no bearing on whether there was actually a transfer of territory, whether the statutory schemes set forth in R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89 apply to the agreements, and whether the agreements are valid and enforceable.

{¶ 45} Accordingly, neither R.C. 3311.06 nor Ohio Adm.Code Chapter 3301-89 required Beachwood and Warrensville Heights to obtain the Ohio Board of Education's approval, and both parties had the ability to enter into the agreements. The trial court therefore erred in finding that Warrensville Heights is entitled to judgment as a matter of law on Beachwood's breach-of-contract claims on this basis.

## IV. Fiscal Certificates

{¶ 46} Next, Beachwood argues that no fiscal certificates were necessary for the agreements to be valid because the agreements were not "qualifying contracts," did not involve the expenditure of funds, and did not involve an amount of money that was ascertainable at the time the agreements were executed. Warrensville Heights argues that R.C. 5705.41 and R.C. 5705.412 required fiscal certificates to be attached to the agreements because the agreements involved "expenditures." Warrensville Heights maintains that the absence of such certificates renders the agreements void, relying on *CADO Business Sys. of Ohio v. Bd. of Edn.*, 8 Ohio App.3d 385, 457 N.E.2d 939 (8th Dist.1983). Warrensville Heights further disputes that the speculative nature of the future tax revenue obviates the need for fiscal certificates.

{¶ 47} The fiscal certificates that R.C. 5705.41 and 5705.412 require limit the ability of public agencies to spend public funds. 1 Anderson, *Ohio School Law Guide*, Section 5.07 (2020). These statutes require educational boards to "certify the adequacy of revenues for appropriation measures, wage and salary schedule increases, and certain contracts." *Id.*; *see also State ex rel. Tele-Communications, Inc. v. McCormack*, 44 Ohio App.3d 49, 50, 541 N.E.2d 483 (8th Dist.1988) (the fiscal officer's "duty is to certify that funds required to meet the obligations are available.").

{¶ 48} R.C. 5705.41 is titled "Restriction upon appropriation and expenditure of money — certificate of fiscal officer." R.C. 5705.41 requires that a certificate of a fiscal officer be attached to each contract involving the expenditure of money. The certificate must state that the amount of funds needed to satisfy the contract have been, or are in the process of being, appropriated and free from encumbrances. R.C. 5705.41. The statute states in relevant part that "No subdivision or taxing unit shall":

> (B) Make any expenditure of money unless it has been appropriated as provided in such chapter;
>
> * * *
>
> (D)(1) * * * [M]ake any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obligation or, in the case of a continuing contract to be performed in whole or in part in an ensuing fiscal year, the amount required to meet the obligation in the fiscal year in which the contract is made, has been lawfully appropriated for such purpose and is in the treasury or in the process of collection to the credit of an appropriate fund free from any previous encumbrances. This certificate need be signed only by the

subdivision's fiscal officer. Every such contract made without such a certificate shall be void, and no warrant shall be issued in payment of any amount due thereon. * * *

{¶ 49} R.C. 5705.412, titled "Certificate of revenue required for school district expenditures," applies specifically to educational boards and imposes certificate requirements beyond those of R.C. 5705.41. 1 Anderson, *Ohio School Law Guide*, Section 5.07 (2020). The certificate must be made not only by a fiscal officer, but also by the superintendent and the president of the board of education. R.C. 5705.412. The certificate must contain more information than the certificates pursuant to R.C. 5705.41. The version of R.C. 5705.412 that was in effect in 1997 states in pertinent part:

> Notwithstanding section 5705.41 of the Revised Code, no school district shall adopt any appropriation measure, make any contract, give any order involving the expenditure of money, or increase during any school year any wage or salary schedule unless there is attached thereto a certificate signed by the treasurer and president of the board of education and the superintendent that the school district has in effect for the remainder of the fiscal year and the succeeding fiscal year the authorization to levy taxes including the renewal or replacement of existing levies which, when combined with the estimated revenue from all other sources available to the district at the time of certification, are sufficient to provide the operating revenues necessary to enable the district to maintain all personnel, programs, and services essential to the provision of an adequate educational program for all the days set forth in its adopted school calendars for the current fiscal year and for a number of days in the succeeding fiscal year equal to the number of days instruction was held or is scheduled for the current fiscal year. * * * In addition, a certificate attached, in accordance with this section, to any contract shall cover the term of the contract or the current fiscal year plus the two immediately succeeding fiscal years, whichever period of years is greater. * * * Every contract made, order given, or schedule adopted or put into effect without such a certificate shall be void, and no payment of any amount due thereon shall be made. The department of education and the auditor of state jointly shall develop

rules governing the methods by which treasurers, presidents of boards of education, and superintendents shall estimate revenue and determine whether such revenue is sufficient to provide necessary operating revenue for the purpose of making certifications required by this section.

{¶ 50} The text of R.C. 5705.41 and 5705.412 shows that both statutes apply to contracts involving the expenditure of money. *See also Grand Valley Local School Dist. Bd. of Edn. v. Buehrer Group Architecture & Eng., Inc.*, 2016-Ohio-716, 48 N.E.3d 626, ¶ 31 (10th Dist.) ("Because the MOU was not an agreement that authorized any particular expenditure of funds, it was not required to be accompanied by a certification of funds under either statutory provision [R.C. 5705.41 or 5705.412]."). Warrensville Heights argues that Chapters 101, 102, and 121 of the Ohio Revised Code define "expenditure" to include "a contract, promise, or agreement to make an expenditure, whether or not legally enforceable." R.C. 101.70(D)(2); 101.90(B)(2); 102.01(L); 121.60(B)(2). Warrensville Heights maintains that "an agreement to potentially share tax revenue in the future" is an "expenditure."

{¶ 51} We disagree. We note that R.C. Chapter 5705 does not define "expenditure," but even using the definition provided by Warrensville Heights, the agreements here do not involve expenditures. To the contrary, the agreements provide for the sharing of tax revenue: obtaining funds, not spending funds. Indeed, under R.C. 5705.41(D), taxes and revenue in the process of collection are "deemed" to be in the treasury or the appropriate fund that the fiscal officer certifies meets an obligation for the expenditure of money. And under former R.C. 5705.412, the

"superintendents shall estimate revenue" and determine whether it is sufficient "for the purpose of making certifications required by this section." The collection of tax revenue is used to cover the expenditure of funds; it is not an expenditure itself. Accordingly, the agreements were not required to include fiscal certificates pursuant to R.C. 5705.41 and 5705.412.

{¶ 52} Beachwood's argument that the agreements are not "qualifying contracts" pursuant to R.C. 5705.412 lacks merit because the version of R.C. 5705.412 that was in effect when the agreements were executed does not refer to "qualifying contracts." The phrase "qualifying contracts" was not added to R.C. 5705.412 until an amendment in 2000. Warrensville Heights' reliance on *CADO Business Sys. of Ohio*, 8 Ohio App.3d 385, 457 N.E.2d 939, is also misplaced because its holding that a contract is void if it fails to comply with R.C. 5705.412 is irrelevant when R.C. 5705.412 is not implicated. Moreover, the parties' dispute about whether the certificates were needed even though the amount of tax revenue to be shared was speculative at the time the agreements were executed also misses the point. R.C. 5705.41 and 5705.412 apply only to the expenditure of funds, and the collection of tax revenue, regardless of how speculative it is, is not an expenditure of funds.

{¶ 53} Accordingly, the certificate requirements of R.C. 5705.41 and 5705.412 do not apply to the agreements, and the agreements are not void for failing to include fiscal certificates. Because the parties had the authority to contract with each other and the agreements did not require Ohio Board of Education approval or

fiscal certificates, the agreements are valid and enforceable. The parties did not brief, and the trial court did not consider, whether each party breached the agreements and the amount of damages owed. Genuine issues of material fact exist regarding these topics. Warrensville Heights is therefore not entitled to judgment as a matter of law on Beachwood's breach-of-contract claims.

## V. Tort Claims

{¶ 54} Lastly, Beachwood argues that the trial court erred in granting Warrensville Heights summary judgment on Beachwood's claims for promissory estoppel, unjust enrichment, fraud, and conversion. Beachwood maintains that the trial court essentially dismissed these claims as moot and failed to engage in any of the three-tiered analysis of political-subdivision immunity. Beachwood contends that Warrensville Heights is not automatically immune from these claims because there is a genuine issue of material fact regarding whether Warrensville Heights engaged in a proprietary function by entering the agreements. Warrensville Heights argues that it was engaged in a governmental function and, as a political subdivision, is thus immune from Beachwood's tort claims.

{¶ 55} In the trial court's opinion supporting its journal entry granting summary judgment, the trial court stated:

> Because the parties were without authority to contract absent the final approval of the State Board, the court finds no valid contract was formed and Plaintiff's remaining counts for promissory estoppel, unjust enrichment, conversion, and fraud fail.

{¶ 56} As previously discussed, we find that the parties had the authority to contract and that their agreements were valid without approval from the Ohio Board

of Education and without fiscal certificates. We therefore reverse the trial court's grant of summary judgment on Beachwood's claims for promissory estoppel, unjust enrichment, fraud, and conversion and remand for the trial court to consider these claims consistent with this opinion.

{¶ 57} Accordingly, we sustain Beachwood's sole assignment of error and reverse the trial court's grant of summary judgment to Warrensville Heights on all of Beachwood's claims. We remand for the trial court to consider Beachwood's tort claims and whether Warrensville Heights has immunity, and to resolve the remaining factual disputes regarding Beachwood's breach-of-contract claims.

{¶ 58} Judgment reversed and remanded.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., CONCURS WITH SEPARATE CONCURRING OPINION;
ANITA LASTER MAYS, J., DISSENTS WITH SEPARATE DISSENTING OPINION

SEAN C. GALLAGHER, J., CONCURRING:

**{¶ 59}** I fully concur with the majority opinion. I agree that the 1997 agreements are valid and enforceable, that R.C. 3311.06 and Ohio Adm.Code 3301-89 have no application in this matter because no transfer of territory is involved, that the agreements did not need approval by the Ohio Board of Education, and that no fiscal certificates were necessary. I concur with the entire analysis set forth in the majority opinion and agree that the trial court erred in granting Warrensville Heights' motion for summary judgment.

**{¶ 60}** Nonetheless, I certainly understand the concerns raised by the dissent in this matter. I also recognize that historically, there have been disparities in Ohio's public-school financing system, which impacted under-resourced school districts that serve low-income communities. These disparities were addressed by the Supreme Court of Ohio in the *DeRolph* line of cases.

**{¶ 61}** In *DeRolph v. State*, 78 Ohio St.3d 193, 1997-Ohio-84, 677 N.E.2d 733 (*DeRolph* I), the Supreme Court of Ohio held, at that time, that "Ohio's public elementary and secondary school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state." *Id.* at 212. The court recognized there were wealth-based disparities among Ohio's school districts that deprived many of Ohio's public-school students of high-quality educational opportunities. *Id.* at 198. The court was cognizant of the limitations imposed upon it and was not advocating "a 'Robin Hood' approach to school financing reform" or suggesting that "funds be diverted from

wealthy districts to the less fortunate." *Id.* at 211. The court found that it was for the General Assembly to create a new school financing system, requiring a "complete systematic overhaul," and to enact remedial legislation. *Id.* at 212-213.

{¶ 62} In *DeRolph v. State*, 89 Ohio St.3d 1, 2000-Ohio-437, 728 N.E.2d 993 ("*DeRolph* II"), wherein the Supreme Court of Ohio agreed that the initial attempt to revise the school-funding system was still unconstitutional, the court recognized the problems associated with "funding systems that rely too much on local property taxes" and "the inadequacies of a system that is overreliant on local property taxes." *Id.* at 8. The court found that in order to create a thorough and efficient system of statewide common schools, that "[s]ignificant changes had to be made in the way primary and secondary public education is funded * * *." *Id.* at 11. Although the court did not give the General Assembly precise instructions on fixing the school funding system, it highlighted several areas that needed attention. The court reiterated that it was for "the General Assembly to legislate a remedy" and that it was not the role of the court to fashion a remedy. *Id.* at 12. *See also DeRolph v. State*, 97 Ohio St.3d 434, 2002-Ohio-6750, 780 N.E.2d 529 ("*DeRolph* IV") (finding that *DeRolph* I and *DeRolph* II are the law of the case and that the then existing school-funding system was unconstitutional).

{¶ 63} Post-*DeRolph* litigation, the Ohio's General Assembly has made changes to Ohio's school funding system. A statutory school funding system was implemented that specifies a per-pupil formula amount and uses that amount, along with a district's "state share index" to calculate a district's base payment, and also

includes payments for targeted assistance (based on a district's property value and income), supplemental targeted assistance (based on a district's percentage of agricultural property), as well as other considerations. *See* Ohio Legislative Service Comm., *Final Analysis for H.B. 166, 133rd General Assembly*, pg. 132, https://www.lsc.ohio.gov/documents/budget/133/MainOperating/FI/BillAnalysis /19-HB166-133.pdf (accessed Sept. 9, 2020). In H.B. 166 of the 133rd General Assembly (the budget act for fiscal years 2020-2021), the statutory school funding system was retained in existing law, but it was suspended for fiscal years 2020 and 2021. *Id.* Instead, the act provides for payments to be made based on the district's funding for fiscal year 2019 and requires use of the district's "state share index" or "state share percentage" computed for the district for fiscal year 2019. *Id.* The act also provides for the payment of student wellness and success funds and enhancement funds. *Id.* at pgs. 133-134.

{¶ 64} Consistent with the *DeRolph* litigation, the General Assembly has created a new school financing system and enacted legislation in its effort to comply with the requirement of providing a thorough and efficient system of common schools throughout the state. Nevertheless, disparities between school districts seemingly remain. This lawsuit is the very embodiment of those ongoing problems.

{¶ 65} In any event, this court cannot fashion a remedy that is not supported by the law and barring further action by the Supreme Court of Ohio, any remedy remains within the province of the legislature. I am compelled by law to fully concur with the majority opinion.

ANITA LASTER MAYS, J., DISSENTING:

{¶ 66} I respectfully dissent from the majority's opinion and would find that the trial court did not err in granting summary judgment in favor of Warrensville Heights City School District and against Beachwood City School District.

{¶ 67} The crafters of the Ohio Constitution "carried within them a deep-seated belief that liberty and individual opportunity could be preserved only by educating Ohio's citizens." *DeRolph v. State*, 78 Ohio St.3d 193, 197, 677 N.E.2d 733 (1997). It is for this reason that

> education was made part of our first Bill of Rights. Section 3, Article VIII of the Ohio Constitution of 1802. Beginning in 1851, our Constitution has required the General Assembly to provide enough funding to secure a "thorough and efficient system of common schools throughout the State."

*Id.* "The responsibility for maintaining a thorough and efficient school system falls upon the state." *Id.* at 210. "When a district falls short of the constitutional requirement that the system be thorough and efficient, it is the state's obligation to rectify it." *Id.*, citing *Dupree v. Alma School Dist.*, 279 Ark. 340, 349, 651 S.W.2d 90 (1983).

{¶ 68} Ohio recognizes that

> "The mission of education is to prepare students of all ages to meet, to the best of their abilities, the academic, social, civic, and employment needs of the twenty-first century, by providing high-quality programs that emphasize the lifelong skills necessary to continue learning, communicate clearly, solve problems, use information and technology effectively, and enjoy productive employment." State Board of Education, Preparing Ohio Schools for the 21st Century, Sept. 1990, ii.

*Id.* at 197.

{¶ 69} The Ohio Department of Education ("ODE") "is the administrative unit and organization through which the policies, directive, and powers of the State Board of Education are administered." *Cuyahoga Falls City School Dist. Bd. of Edn. v. Ohio Dept. of Edn.*, 118 Ohio App.3d 548, 554, 693 N.E.2d 841 (10th Dist.1997), citing R.C. 3301.13, paragraph one.

{¶ 70} R.C. 3311.06 governs the annexation procedure for school district property. Generally, annexation involves a transfer of title to real estate, buildings, and tax revenue. Approval of the annexation or any agreement reached to effect annexation as provided in the statute requires ODE approval where a "territory annexed to a city or village comprises part but not all of the territory of a school district." *In re Proposed Annexation by Columbus City School Dist.*, 45 Ohio St.2d 117, 118, 341 N.E.2d 589 (1976), citing R.C. 3311.06. Ohio Constitution, Article II, Section 26, "expressly sanctions both the delegation of legislative authority by the General Assembly in R.C. 3311.06 and the exercise of that authority by the State Board of Education." *Id.* at 120.

{¶ 71} It is undisputed that:

On March 20, 1990, the Chagrin Land was annexed by the city of Beachwood but remained within the Warrensville SD;

On October 23, 1990, Beachwood SD filed a petition with the ODE to transfer the Chagrin Land to Beachwood SD pursuant to R.C. 3311.06;

The parties engaged in mediation with Judge Duncan as documented by the Duncan Memorandum and Duncan Recommendation issued by Judge Duncan;

The mediation was conducted as required by R.C. 3311.06(C)(2);

The parties executed the Chagrin Agreement;

The respective boards approved the Chagrin Agreement;

The Chagrin Agreement provides that the R.C. 3311.06 petition was still pending at the time the Chagrin Agreement was executed;

Beachwood SD's ratifying resolution specifically provided that the R.C. 3311.06 petition was still pending at the time of adoption; and

That Beachwood SD withdrew the petition on July 8, 1998, as provided in the Chagrin Agreement.

{¶ 72} The majority finds that the Chagrin Agreement is simply a settlement agreement subject to general contract principles that resolved the Chagrin Land transfer tax revenue dispute. I respectfully disagree and determine that R.C. 3311.06 and Ohio Admin.Code Chapter 3301-89 are applicable. I would find that ODE's approval is a mandatory prerequisite to validity of the Chagrin Agreement and the absence of a physical land transfer does not negate the application of the ODE regulations.

{¶ 73} The interpretation of a statute requires that we

first look at its language to determine legislative intent. *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105, 304 N.E.2d 378 (1973). When a statute's meaning is clear and unambiguous, we apply the statute as written. *Id.* at 105-106. We must give effect to the words used, refraining from inserting or deleting words. *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 53-54, 524 N.E.2d 441 (1988). If a legislative definition is available, we construe the words of the statute accordingly. R.C. 1.42.

*State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, ¶ 4.

**{¶ 74}** In addition,

"[T]he application of [a statute] to the facts is a 'question of law' — [a]n issue to be decided by the judge, concerning the application or interpretation of the law. *Black's Law Dictionary* (7 Ed.1999) 1260." [*Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 148, 2000 Ohio 493, 735 N.E.2d 433 (2000)]. *Accord Lang v. Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12 ("A question of statutory construction presents an issue of law that we determine de novo on appeal").

*Cleveland Clinic Found. v. Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 25.

**{¶ 75}** As explained in Anderson's *Ohio School Law Guide*:

A school district is a political entity created by legislative enactment and organized as an agency of the state to maintain its system of public schools. * * * A school district is a quasi-corporation. It is a political or civil division of the state; it is established as an agency or instrumentality of the state for the purpose of facilitating the administration of government. Education is a government function. A school district functions in the execution of state government or state policy. It possesses limited powers. The powers, duties, and liabilities of a school district are only such as are prescribed by statute. It has no common law powers.

*Ohio School Law Guide*, Section 2.01, 1-2 (2018).

**{¶ 76}** The corporate powers of the board of a school district are set forth in R.C. 3313.17:

The board of education of each school district shall be a body politic and corporate, and, as such, capable of suing and being sued, contracting and being contracted with, acquiring, holding, possessing, and disposing of real and personal property, and taking and holding in trust for the use and benefit of such district, any grant or devise of land and any donation or bequest of money or other personal property.

*Id.*

{¶ 77} School districts are charged with the "constitutional mandate" "to insure a thorough and efficient system of public elementary and secondary schools." *Ohio School Law Guide*, Section 2.11, 1-2 (2018).

> [T]he procedure with reference to territorial organization in relation to changing the boundaries of school districts, the transfer of territory in connection therewith, the creation and dissolution of school districts and the consolidation of districts, is provided exclusively by the legislature. Any procedure undertaken in such matters must be in accord with the method or methods prescribed by statutory law in existence at such time. Officials authorized by the legislature to establish school districts or to change their boundaries must follow the procedure prescribed by statute.

*Ohio School Law Guide*, Section 2.11, 1-2 (2018).

{¶ 78} The General Assembly has legislated procedures for the various types of territorial transfers. R.C. 3311.06 governs transfers "of school district territory in conjunction with a municipal annexation, either by action of the State Board of Education or by agreement between the districts affected." *Id. Ohio School Law Guide*, Section 2.11, 1-2 (2018).

{¶ 79} Until 1955, "the transfer of school district territory to an adjoining city for municipal purposes * * * automatically resulted in a corresponding transfer of school district territory." *Id.* at § 2.22. In 1955, R.C. 3311.06 was amended "to require approval of such transfers by the newly-created" ODE and was more extensively amended in 1986. *Id. See also* Ohio Att. Gen. Op. No. 6808, July 7, 1956.

{¶ 80} Subsequent to 1986, "[i]n order to encourage the resolution of annexation disputes by means of interdistrict agreements, the General Assembly"

provided "boards of education [with] broad powers to negotiate annexation agreements which satisfy the needs of all school districts concerned." *Ohio School Law Guide*, Section 2.22, 1-2 (2018).

{¶ 81} For example, the school districts involved may negotiate for interdistrict payments to the city school district to "share the wealth" that results from development in territory annexed by the city [fn. 5., R.C. 3311.06(F). *See, e.g., Miami Trace Local School Dist. Bd. of Edn. v. Washington Court House City School Dist. Bd. of Edn.*, 12th Dist. Fayette No. CA2031-01-001, 2013-Ohio-3578 (involving interpretation of tax-sharing agreement)] and may establish mechanisms for the settlement of future boundary disputes. [Fn. 6., R.C. 3311.06(D)].

{¶ 82} "All annexation agreements adopted after the 1986 amendments *must be approved by the State Board of Education.*" (Emphasis added.) *Ohio School Law Guide*, Section 2.22, 1-2 (2018), citing R.C. 3311.06(A)(4). An "annexation agreement" is an agreement that meets the requirements of R.C. 3311.06(F) and that "has been filed with the state board." *Id.*

{¶ 83} To secure ODE approval of a transfer under R.C. 3311.06, a school district is required to

> make a good faith effort to negotiate the terms of transfer with any other school district whose territory would be affected by the transfer. Before the state board may approve any transfer of territory to a school district, except an urban school district, under this section, it must receive the following:
>
> (a)    A resolution requesting approval of the transfer, passed by at least one of the school districts whose territory would be affected by the transfer;

(b)     Evidence determined to be sufficient by the state board to show that good faith negotiations have taken place or that the district requesting the transfer has made a good faith effort to hold such negotiations;

(c)     If any negotiations took place, a statement signed by all boards that participated in the negotiations, listing the terms agreed on and the points on which no agreement could be reached.

R.C. 3311.06(C)(2).

{¶ 84} R.C. 3311.06(D) sets forth the goals to be achieved by annexation:

The state board of education shall adopt rules governing negotiations held by any school district except an urban school district pursuant to division (C)(2) of this section. The rules shall encourage the realization of the following goals:

(1)     A discussion by the negotiating districts of the present and future educational needs of the pupils in each district;

(2)     The educational, financial, and territorial stability of each district affected by the transfer;

(3)     The assurance of appropriate educational programs, services, and opportunities for all the pupils in each participating district, and adequate planning for the facilities needed to provide these programs, services, and opportunities.

Districts involved in negotiations under such rules may agree to share revenues from the property included in the territory to be transferred, establish cooperative programs between the participating districts, and establish mechanisms for the settlement of any future boundary disputes.

{¶ 85} In addition, R.C. 3311.06(I) provides in critical part that:

*No transfer* of school district territory *or division of funds and indebtedness incident thereto*, pursuant to the annexation of territory to a city or village shall be completed in any other manner than that prescribed by this section regardless of the date of the commencement of such annexation proceedings, and this section applies to all proceedings for such transfers and divisions of funds and indebtedness pending or commenced on or after October 2, 1959.

(Emphasis added.) *Id. See also Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 20.

{¶ 86} The rules promulgated to implement R.C. 3311.06 are codified at Ohio Adm.Code Chapter 3301-89 that was first adopted in 1987. Ohio Adm.Code 3301-89-01 addresses the general policies of the ODE and applies to "requests for a transfer of territory following municipal annexation under section 3311.06." *Id.*[4] The parties are required to "enter into good faith negotiations when it is required under R.C. 3311.06." Ohio Admin.Code 3301-89-01(C).

{¶ 87} "In situations where agreement has been reached between respective boards of education, the terms of agreement should be sent to the state board of education with reasonable dispatch." Ohio Adm.Code 3301-89-01(D). "A request for transfer of territory shall be considered upon its merit with primary consideration given to the present and ultimate good of the pupils in the affected districts." Ohio Admin.Code 3301-89-01(F).

{¶ 88} Ohio Admin.Code 3301-89-02(A)(1)(a)-(e) lists the procedure and requirements for filing initial transfer requests. Pertinent here,

> (3)    Upon receipt of a negotiated agreement, the state board of education *shall* determine whether to approve the agreement and adopt a resolution. The state board of education may conduct a hearing before determining whether to approve or disapprove the negotiated agreement.

(Emphasis added.) Ohio Admin.Code 3301-89-02(A)(3).

---

[4] Ohio Admin.Code 3301-89 also applies to R.C. 3311.24 for transfers from and to an adjoining city board of education, exempt village, or school district under the listed circumstances.

{¶ 89} Where negotiations "have failed to produce an agreement, the [ODE] shall send" a request to both school districts that contains twenty-five questions for the ODE and, if necessary, a hearing officer, to consider.

{¶ 90} If the ODE determines that a hearing is required, Ohio Admin.Code 3301-89-03 contains a nonexclusive list of factors for hearing officer consideration of a transfer request. While the students affected are the paramount concern, "the *fiscal resources* acquired should be commensurate with the educational responsibilities assumed." (Emphasis added.) Ohio Admin.Code 3301-89-03(B)(9).

{¶ 91} Ohio Admin.Code 3301-89-04 sets forth the "[p]rocedures governing negotiations of school districts" to reach an annexation agreement. Ohio Admin.Code 3301-89-04(A) provides eight steps for the negotiation of an agreement, and subsection (B) lists the goals that the process should "strive for." Subsection (C) contains "[e]xamples of terms that school districts may agree to include sharing property revenue in the transfer territory, establishing cooperative educational programs and mechanisms for the settlement of future boundary disputes and that [n]o tax revenue" will give provided "to the receiving district" "for a period of time." Subsection (D) lists items that ODE must receive for approval, denial or a hearing on the transfer.

{¶ 92} Once an agreement has been reached, it "*shall* be adopted by each board of education" by resolution and both shall be forwarded to the ODE for approval. (Emphasis added.) Ohio Admin.Code 3301-89-04(A)(7).

{¶ 93} The parties' records reflect that the entire process was governed by R.C. 3311.06 and the corresponding Ohio Administrative Code requirements. This conclusion is affirmed by the ODE's response to Beachwood SD's initiating petition and subsequent correspondence. The Beachwood SD resolution approving the Chagrin Agreement, as well as the preamble to the Chagrin Agreement itself, state that the R.C. 3311.06 petition was still pending at that time.

{¶ 94} The Chagrin Agreement cites the R.C. 3311.06 negotiation procedure and states that "such an agreement will thus clearly be in the best interests of Beachwood and Warrensville Heights" and not that the best interest of the students would be served. Beachwood SD agrees to "withdraw its request to transfer" the Chagrin Land and "shall not institute any further such request." Thus, the Chagrin Land remained with Warrensville SD and Beachwood SD agreed that it would not attempt to annex the Chagrin Land again if the Warrensville Heights SD agrees to share revenue.

{¶ 95} Beachwood SD offers that without a transfer of the Chagrin Land, the statute does not apply. I find that such an interpretation would allow a school district to petition for annexation to induce the affected district to enter into an agreement that does not comply with the legislative intent and statutory purposes, policies, and history and does not protect the welfare of the students.

{¶ 96} Under R.C. 3301.07, the ODE is charged by the General Assembly with supervision of the public education system. The ODE "shall administer the

educational policies of this state relating to public schools, * * * finance and organization of school districts * * * and territory." R.C. 3301.07(B)(1).

{¶ 97} The ODE is unilaterally vested with the authority to protect the best interests of the students and provide an objective body to weigh the pros and cons of such an agreement by utilizing the detailed and legislatively authorized standards and procedures set forth in R.C. 3311.06 and the Ohio Administrative Code.[5] I would find the fact that parties may agree to retain all or part of the land in issue in exchange for revenue or services evidences the ODE intent that such provisions may be part of the R.C. 3311.06 negotiations. *See* Ohio Admin.Code 3301-89-04(C) that lists examples of terms the parties may agree to.

{¶ 98} The ODE is uniquely empowered to approve the Chagrin Agreement to ensure that the statutory goals are met. ODE approval is a condition precedent that must be met to create an enforceable and binding agreement as a matter of law.

> "The entire legislation regulating school districts, and especially that part regulating the establishment of public school districts in territory annexed to a city, is indeed remedial. There is no vested right in the establishment or transfer of a school district in, or to, a particular territory. The entire matter is subject to legislative control; and legislation treating these problems is remedial in the sense that it is directed solely to the advancement of the public welfare. *See* 50 American Jurisprudence, 420, Statutes, Section 395; 82 Corpus Juris Secundum, 918, Statutes, Section 388; and cases cited."

---

[5] Warrensville SD provides statistical information intended to address some of the factors the ODE contemplates in entertaining annexation requests, such as that the transfer of revenue without the Chagrin Land would reportedly allow Beachwood SD to realize additional tax revenue from the Chagrin Land without potential future liabilities. The information is indicative of the factors the ODE considers; however, it is merely informational for the purposes of this appeal.

*State ex rel. Bd. of Edn. v. Bd. of Edn.*, 172 Ohio St. 237, 240, 175 N.E.2d 91 (1961), quoting *Bohley v. Patry*, 107 Ohio App. 345, 159 N.E.2d 252 (9th Dist.1958).

{¶ 99} The failure to secure ODE approval is fatal to enforcement. A finding that the specific statutory provisions may be bypassed by relabeling the Chagrin Agreement to pull it outside of the realm of ODE governance contravenes the purpose of the statutory scheme and legislative intent and renders the Chagrin Agreement void and unenforceable.

{¶ 100} As this court has previously recognized,

> "[i]t is a long-standing principle of Ohio law that 'all governmental liability ex contractu must be express and must be entered into in the prescribed manner, and that a municipality or county is liable neither on an implied contract nor upon a quantum meruit by reason of benefits received.'" *Kraft Constr. Co. v. Cuyahoga Cty. Bd. of Commrs.*, 128 Ohio App.3d 33, 44, 713 N.E.2d 1075 (8th Dist.1998), citing 20 Ohio Jurisprudence 3d, Counties, Townships and Municipal Corporations, Section 278, at 241 (n.d.); *Shampton v. Springboro*, 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883 (holding that city was not liable on the basis of promissory estoppel even though tenant was induced by city's promise of a long term lease to invest in a restaurant on city property).

*Sylvester Summers, Jr. Co., L.P.A. v. E. Cleveland*, 8th Dist. Cuyahoga No. 98227, 2013-Ohio-1339, ¶ 25.

{¶ 101} In addition,

> [t]he Ohio Supreme Court has held that an individual or entity entering into a contract with a municipality bears the burden of "'ascertain[ing] whether the contract complies with the Constitution, statutes, charters, and ordinances so far as they are applicable. If he does not, he performs at his peril.'" *Shampton* at ¶ 28, quoting *Lathrop Co. v. Toledo*, 5 Ohio St.2d 165, 173, 214 N.E.2d 408 (1966). Therefore, Summers's quasi-contract claims of promissory estoppel, unjust enrichment, and quantum meruit are not actionable against the City.

*Id.* at ¶ 26.

{¶ 102} In this case, the parties are school districts equally charged with responsibility for statutory compliance.  I determine, construing the evidence most strongly in favor of Beachwood SD, the trial court did not err in finding there is no genuine issue of material fact and Warrensville SD is entitled to judgment as a matter of law.  *Harless*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978); Civ.R. 56(C).