[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Beachwood City School Dist. Bd. of Edn. v. Warrensville Hts. City School Dist. Bd. of Edn.*, Slip Opinion No. 2022-Ohio-3071.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3071

BEACHWOOD CITY SCHOOL DISTRICT BOARD OF EDUCATION, APPELLEE, *v.* WARRENSVILLE HEIGHTS CITY SCHOOL DISTRICT BOARD OF EDUCATION, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Beachwood City School Dist. Bd. of Edn. v. Warrensville Hts. City School Dist. Bd. of Edn.*, Slip Opinion No. 2022-Ohio-3071.]

*Agreement made in 1997 between two city school district boards of education is valid and enforceable—Former R.C. 3311.06 is not applicable to 1997 agreement, because no territory was transferred from one school district to the other—Neither former R.C. 5705.41 nor former R.C. 5705.412 required that a fiscal certificate be attached to the 1997 agreement, because the agreement does not involve the expenditure of money.*

(No. 2020-1326—Submitted October 6, 2021—Decided September 6, 2022.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 108253, 2020-Ohio-4459.

————————————

**O'CONNOR, C.J.**

{¶ 1} In 1990, the city of Beachwood annexed approximately 405 acres of land known as the Chagrin Highlands, which is part of the Warrensville Heights City School District. Appellee, the Beachwood City School District Board of Education ("Beachwood"), sought approval from the state board of education for a transfer of the annexed territory to the Beachwood City School District, over the objection of appellant, the Warrensville Heights City School District Board of Education ("Warrensville Heights").

{¶ 2} In 1997, following several years of negotiations, Beachwood and Warrensville Heights agreed that the Chagrin Highlands territory would not transfer to the Beachwood City School District but that the districts would instead share the tax revenue generated from real property located within the territory. This appeal concerns the enforceability of that agreement.

{¶ 3} Because we conclude that the parties' agreement is valid and enforceable, we affirm the judgment of the Eighth District Court of Appeals, which reversed the Cuyahoga County Court of Common Pleas' entry of summary judgment in favor of Warrensville Heights.

## R.C. 3311.06

{¶ 4} To provide context for the facts of this case and the parties' primary arguments, we begin by reviewing R.C. 3311.06, which charges the state board of education with approving or disapproving a transfer of school-district territory following an annexation of territory that includes part, but not all, of a school district's territory. All citations to R.C. 3311.06 in this opinion refer to the version of the statute that was in effect in 1997, when the parties executed their agreement. *See* Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3341, 3641.

{¶ 5} When a city annexes territory that includes part, but not all, of a school district's territory, the annexed territory remains part of that school district unless the state board of education approves a transfer of the annexed territory to the city

school district.[1]   R.C. 3311.06(C)(2).   R.C. 3311.06 prescribes the exclusive process for obtaining the state board's approval: "No transfer of school district territory or division of funds and indebtedness incident thereto, pursuant to the annexation of territory to a city or village shall be completed in any other manner than that prescribed by this section * * *."  R.C. 3311.06(I).

{¶ 6} To obtain the state board's approval, the school board of at least one district whose territory would be affected by the transfer must first pass a resolution requesting the state board's approval and submit the resolution to the state board. R.C. 3311.06(C)(2)(a).  The requesting district must also "make a good faith effort to negotiate the terms of transfer with any other school district whose territory would be affected by the transfer."  R.C. 3311.06(C)(2).  Ohio Adm.Code 3301-89-04 sets out procedures that govern those negotiations.  As part of their negotiations, school districts "may agree to share revenues from the property included in the territory to be transferred, establish cooperative programs between the participating districts, and establish mechanisms for the settlement of any future boundary disputes."  R.C. 3311.06(D); *see also* Ohio Adm.Code 3301-89-04(C). If negotiations take place, school districts seeking state-board approval of a transfer of territory must submit to the state board a statement, signed by the participating school boards, of the terms the parties have agreed on and the points on which they could not agree.  R.C. 3311.06(C)(2)(c).

{¶ 7} Before the state board may approve or disapprove a transfer of territory, it must receive (1) the resolution required by R.C. 3311.06(C)(2)(a), (2) sufficient evidence that the impacted districts have engaged in good-faith negotiations or that the district requesting the transfer made a good-faith effort to hold such negotiations, R.C. 3311.06(C)(2)(b), and (3) if negotiations have taken

---

1. The requirement and procedures for obtaining the state board's approval do not apply to "urban school district[s]," as defined in R.C. 3311.06(A)(3).  R.C. 3311.06(C)(2).  Neither school district at issue here qualifies as an urban school district.

place, the statement required by R.C. 3311.06(C)(2)(c) of the terms the parties have agreed on and the points on which they could not agree. Also before approving a transfer of territory, the state board must determine that "an equitable division of the funds and indebtedness between the districts," R.C. 3311.06(G), has been made. R.C. 3311.06(H).

{¶ 8} With these procedures in mind, we now turn to the facts of this case.

### Facts and procedural background

#### *Beachwood requests a transfer of annexed territory*

{¶ 9} In October 1990, Beachwood initiated the statutory process described in R.C. 3311.06 by passing a resolution requesting the approval of a transfer of the Chagrin Highlands territory from the Warrensville Heights City School District to the Beachwood City School District and filing that resolution with the state board. Warrensville Heights opposed the requested transfer.

{¶ 10} The districts engaged in negotiations but were unable to reach an agreement on their own. They eventually engaged retired federal judge Robert M. Duncan to serve as a facilitator. Following mediation with the parties in November 1996 and January 1997, Judge Duncan issued written recommendations in April 1997. Judge Duncan recommended that the Chagrin Highlands territory remain part of the Warrensville Heights City School District but that the parties share real-estate tax revenue "generated from that amount of market value of the property [within the territory] (as determined by the Auditor) which exceeds * * * $22,258,310."[2] Judge Duncan recommended that, absent an abatement of real-estate taxes in the Chagrin Highlands territory, Beachwood receive 30 percent of the tax revenue generated by nonresidential and nonagricultural property and that Warrensville Heights receive the remaining 70 percent. Judge Duncan noted that

---

2. The Chagrin Highlands territory was slated for commercial development that was to include offices, shops, and possibly a hotel.

the districts' representatives had agreed to support their respective school boards' adoptions of the recommendations.

### *The parties agree to settle their dispute without a transfer of territory*

{¶ 11} In May 1997, the parties executed a written agreement that incorporated Judge Duncan's recommendations; they characterized the agreement as a "fair and equitable settlement" that was "in the best interests of" both districts. The superintendents, treasurers, and board presidents of both districts signed the agreement, which stated that Beachwood would withdraw from the state board its request for approval of a transfer of the Chagrin Highlands territory, that the territory would remain part of the Warrensville Heights City School District, that the districts would share tax revenue generated from nonresidential and nonagricultural property within the territory as set out in Judge Duncan's recommendations, and that they would engage in joint educational programs and activities to benefit both districts. The parties agreed to "jointly request[]" that the Cuyahoga County auditor and treasurer "calculate and distribute [the shared tax] revenues in each year as provided by [the] Agreement." Both school boards unanimously approved the executed agreement.

{¶ 12} There is no evidence that either Beachwood or Warrensville Heights transmitted the agreement to the state board, but in accordance with the agreement's terms, Beachwood withdrew from the state board its request for approval of a transfer of the Chagrin Highlands territory.

### *Beachwood attempts to enforce the agreement*

{¶ 13} As early as 2013, Beachwood Superintendent Dr. Robert P. Hardis (he was the district's assistant superintendent from August 2012 through July 2015) discussed with representatives of Warrensville Heights the implementation of the agreement's revenue-sharing and joint-educational-programming provisions. Dr. Hardis testified that during discussions and meetings between the districts about the valuation of property within the Chagrin Highlands territory and implementation of

the agreement's revenue-sharing provisions in 2015 or 2016, "[n]o one stated any sense of disagreement or hesitation" about the validity of the agreement. Nevertheless, Warrensville Heights has at all times refused to share with Beachwood the tax revenues generated from the Chagrin Highlands territory.

### *Beachwood turns to the courts to enforce the agreement*

{¶ 14} In 2017, Beachwood sued Warrensville Heights for breach of contract, promissory estoppel, declaratory judgment, and injunctive relief, but the parties filed a stipulated notice of dismissal without prejudice. Dr. Hardis wrote to Warrensville Heights Superintendent Donald J. Jolly II in January 2018, asking Warrensville Heights to reconsider its position that the parties' agreement was invalid and unenforceable. Dr. Hardis claimed that Beachwood was entitled to $5,571,421.99 in tax revenue generated from properties within the Chagrin Highlands territory for tax years 2012 through 2017.

{¶ 15} In August 2018, Beachwood refiled its claims against Warrensville Heights. Beachwood alleged that by refusing to share tax revenue from the Chagrin Highlands territory, Warrensville Heights breached a contract that arose from the parties' adoption of Judge Duncan's recommendations and the May 1997 written agreement that wholly incorporated those recommendations.[3] Beachwood alleged that it had reasonably and foreseeably relied on Warrensville Heights's promise to share tax revenue and that it had conferred a substantial benefit on Warrensville Heights by withdrawing its request to transfer the Chagrin Highlands territory. In addition to restating the claims from its original complaint, Beachwood's refiled complaint contained claims for unjust enrichment, conversion, and fraud. Beachwood alleged that Warrensville Heights had wrongfully converted tax revenue to which Beachwood was entitled and that it had fraudulently represented

---

3. Although Beachwood refers to these as separate agreements, we refer to a single agreement, meaning the written agreement executed on May 12, 1997, and approved by both boards of education.

that it would share the tax revenue and had thereby induced Beachwood to withdraw its transfer request.

{¶ 16} Warrensville Heights moved for summary judgment, and the trial court granted its motion. The court held that the parties lacked "the capacity to contract over the transfer of tax dollars" without the state board's approval and that by not obtaining such approval, the parties failed to complete the steps required by R.C. 3311.06 to finalize an agreement. The court went on to state, "Because the parties were without the authority to contract absent the final approval of the State Board, the court finds no valid contract was formed and [Beachwood's] remaining counts for promissory estoppel, unjust enrichment, conversion, and fraud fail."

{¶ 17} A divided panel of the Eighth District reversed the trial court's judgment. The majority held that the parties' agreement did not require the state board's approval, because it did not call for a transfer of school-district territory. It also rejected Warrensville Heights's alternative argument—which had not been addressed by the trial court—that the parties' agreement was invalid because it lacked a statutorily required fiscal certificate. The dissenting judge, on the other hand, concluded that the failure to secure the state board's approval rendered the parties' agreement void.

{¶ 18} We accepted Warrensville Heights's discretionary appeal, 161 Ohio St.3d 1407, 2021-Ohio-106, 161 N.E.3d 680, which presents three propositions of law. Warrensville Heights firsts asks this court to hold that R.C. 3311.06 and Ohio Adm.Code Chapter 3301-89 require the state board to approve any agreement that relates to a school district's request to transfer territory, regardless of whether the agreement calls for a transfer of territory. It next asks us to hold that the fiscal-certificate requirements in R.C. 5705.41 and 5705.412 apply to agreements between school districts to share tax revenue. Finally, it asks us to hold that R.C. Chapter 2744 cloaks school districts with immunity from tort liability that arises out of an agreement to share tax revenue.

## Analysis

### *R.C. 3311.06 requires the state board to approve only transfers of territory*

{¶ 19} A school board is a statutory creation that possesses only the authority the legislature has conferred on it, either expressly or by clear implication. *Wolf v. Cuyahoga Falls City School Dist. Bd. of Edn.*, 52 Ohio St.3d 222, 223, 556 N.E.2d 511 (1990). It is "a body politic and corporate" that has the power to contract, R.C. 3313.17, but its authority to enter into a particular contract may be limited by statute, *see Hall v. Lakeview Local School Dist. Bd. of Edn.*, 63 Ohio St.3d 380, 383, 588 N.E.2d 785 (1992) (R.C. 3319.081 prohibited school board from entering supplemental contracts with nonteaching employees). R.C. 3311.06 limits a school board's authority to contract to change the composition of school-district territory.

{¶ 20} R.C. 3311.06(C)(2) creates a default rule: when a city or village annexes territory that contains part, but not all, of a school district's territory, the annexed territory remains part of that school district. The statute then sets out the exclusive means for circumventing application of the default rule—by successfully complying with the statutory procedure and obtaining the state board's approval to transfer the annexed territory to the school district that serves the annexing city or village. *See* R.C. 3311.06(I).

{¶ 21} Beachwood initiated the statutory process to obtain the state board's approval for a transfer of the Chagrin Highlands territory, but the parties ultimately agreed that the territory would *not* transfer and that they would instead share tax revenue generated from property within the territory. The question then is whether despite the absence of a transfer of territory, R.C. 3311.06 required the state board's approval to validate the parties' revenue-sharing agreement. We conclude that it did not.

{¶ 22} Our primary goal when analyzing a statute is to give effect to the legislature's intent, which we discern by first looking to the plain statutory

language. *Antoon v. Cleveland Clinic Found.*, 148 Ohio St.3d 483, 2016-Ohio-7432, 71 N.E.3d 974, ¶ 20. We read the words and phrases in context, and we construe them in accordance with the rules of grammar and common usage. *Mahoning Educational Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 137 Ohio St.3d 257, 2013-Ohio-4654, 998 N.E.2d 1124, ¶ 15. If the plain statutory language is unambiguous, we apply it as written. *Antoon* at ¶ 20.

**{¶ 23}** A "transfer of school district territory or division of funds and indebtedness incident thereto" may be completed only in the manner specified by R.C. 3311.06. R.C. 3311.06(I). Beachwood and Warrensville Heights agreed that there would be no "transfer of school district territory" and that Beachwood would withdraw from the state board its request for approval of a transfer. Warrensville Heights, however, maintains that the agreement's validity remained dependent on the state board's approval because it called for a "division of funds" that flowed from Beachwood's initiation of the R.C. 3311.06 process. By its plain terms, R.C. 3311.06(I) does not apply so broadly.

**{¶ 24}** R.C. 3311.06(I) states that if a "division of funds and indebtedness" is "incident []to" a transfer of school-district territory, it must be completed in the "manner * * * prescribed" by R.C. 3311.06. As used in the statute, "incident" connotes a relationship between things. It means "occurring or likely to occur esp. as a minor consequence or accompaniment * * * **:** associated or naturally related or attaching * * * **:** dependent on or appertaining to another thing **:** directly and immediately relating to or involved in something else though not an essential part of it." *Webster's Third New International Dictionary* 1142 (1986). The Eighth District concluded that a "division of funds" cannot be dependent on or appertaining to—i.e., cannot be "incident []to"—a *nonexistent* transfer of school-district territory. 2020-Ohio-4459, 158 N.E.3d 906, ¶ 35. That conclusion is consistent with the plain, ordinary meaning of "incident []to."

**{¶ 25}** Warrensville Heights mischaracterizes the Eighth District's holding as interpreting the phrase "incident []to" as requiring a causal relationship. The court of appeals simply held that for a division of funds to be incident to a transfer of territory, the division of funds must coexist with a transfer of territory, not that one must be the cause of the other. And neither *Kelm v. Kelm*, 68 Ohio St.3d 26, 623 N.E.2d 39 (1993), nor *Woodside v. United States*, 606 F.2d 134 (6th Cir.1979)—the cases that Warrensville Heights cites in support of its argument that "incident to" does not implicate causation—undermines that holding.

**{¶ 26}** In *Kelm*, this court held that an antenuptial agreement that required arbitration of " 'a dispute as to the alimony or child support provisions incident to a termination of [the parties'] marriage' " encompassed disputes that arose "during the pendency of a matrimonial dispute," not just those matters "which are concomitant to a final degree of divorce." *Kelm* at 28. The question in *Kelm* related to timing; no matter when the dispute arose, there could be no alimony or child support without a termination of the parties' marriage. In *Woodside*, the Sixth Circuit addressed a rule that precluded a military service member from suing the government for injuries that were " 'incident to service.' " *Woodside* at 140, quoting *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950). It held that whether an activity is "incident to service" depends on the " 'degree to which the activity is divorced from or related to military service.' " *Id.* at 141, quoting *Schwager v. United States*, 279 F.Supp. 262, 263 (E.D.Pa.1968). There is no suggestion in that case, however, that the decedent's injury could have been "incident to service" had the decedent not been a service member to begin with. Thus, neither case weighs against an understanding, based on the plain statutory language, that R.C. 3311.06(I) applies to a division of funds only if the division relates to an extant transfer of school-district territory.

**{¶ 27}** Looking to other subsections of R.C. 3311.06 confirms our understanding of the phrase "division of funds and indebtedness incident thereto"

10

in subsection (I). R.C. 3311.06(I) requires parties to divide funds and indebtedness in the "manner" prescribed elsewhere in the statute. The phrase "division of funds and indebtedness" first appears in R.C. 3311.06(G), which requires the state board to supervise such a division "[*i*]*n the event territory is transferred* from one school district to another under [R.C. 3311.06]." (Emphasis added.) And R.C. 3311.06(H) then requires the state board to ensure that the division of funds and indebtedness addressed in subsection (G) has been completed before it approves "*such transfer of territory*." (Emphasis added.) Every duty imposed on the state board with respect to a division of funds and indebtedness relates to—and is a prerequisite to—an actual transfer of school-district territory. The statute does not address a division of funds and indebtedness in lieu of a transfer of territory. Inasmuch as R.C. 3311.06(I) requires completion of a division of funds and indebtedness in the manner prescribed by R.C. 3311.06, it applies only to such a division that occurs alongside a transfer of territory. To conclude otherwise would be to write the phrase "incident thereto" out of R.C. 3311.06(I).

{¶ 28} Warrensville Heights next argues that R.C. 3311.06(I) applies to the parties' agreement to share tax revenue because the agreement was incident to Beachwood's *request* for a transfer of territory. Whereas its previous argument essentially eliminated language from R.C. 3311.06(I), this argument impermissibly adds language to the statute. *See Wheeling Steel Corp. v. Porterfield*, 24 Ohio St.2d 24, 28, 263 N.E.2d 249 (1970), quoting *Columbus-Suburban Coach Lines v. Pub. Util. Comm.*, 20 Ohio St.2d 125, 127, 254 N.E.2d 8 (1969) (" 'it is the duty of this court to give effect to the words used [in a statute], not to delete words used *or to insert words not used*' " [emphasis and brackets added in *Wheeling Steel*]). R.C. 3311.06(I) refers to a division of funds incident to a transfer of territory, not to a *request* for a transfer.

{¶ 29} Warrensville Heights fares no better with its citations to other statutory language in support of its position that the parties' agreement was invalid

without the state board's approval. For example, although R.C. 3311.06(C)(2) requires school boards to submit to the state board any agreed-on terms that result from negotiations, that requirement is but a prerequisite to the state board's authority to approve a transfer of territory. *Id.* If there is no transfer of territory to approve, then this prerequisite is immaterial. Likewise unhelpful to Warrensville Heights's argument is R.C. 3311.06(D), which describes terms that parties might include in a negotiated agreement, including an agreement to share tax revenue. Again, the statutory language links an agreement containing such terms to an actual transfer of territory: school districts "may agree to share revenues from the property *included in the territory to be transferred*." (Emphasis added.) *Id.*

{¶ 30} Based on the plain language of R.C. 3311.06 and the parties' agreement that the Chagrin Highlands territory would not transfer to the Beachwood City School District, we conclude that R.C. 3311.06 did not require the state board's approval of the parties' agreement to share tax revenue and that the absence of such approval does not render the agreement unenforceable.

### *R.C. 5705.41 and 5705.412 are inapplicable*

{¶ 31} Warrensville Heights next argues, under its second proposition of law, that the parties' agreement is invalid for the independent reason that a fiscal certificate, as described in R.C. 5705.41 and 5705.412, was not attached to it.

{¶ 32} As it existed in 1997, R.C. 5705.41 required that before making an expenditure, a political subdivision appropriate the funds to be expended, as provided in R.C. Chapter 5705. Former R.C. 5705.41(A) and (B), Am.Sub.S.B. No. 81, 145 Ohio Laws, Part I, 864, 873. In service of that requirement, the statute prohibited a political subdivision from "mak[ing] any contract or giv[ing] any order involving the expenditure of money unless there [was] attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obligation," i.e., the expenditure, "[had] been lawfully appropriated for such purpose." Former R.C. 5705.41(D)(1), Am.Sub.S.B. No. 81, 145 Ohio Laws, Part

I, at 873. A contract that is subject to R.C. 5705.41(D) but that does not contain the required certificate "shall be void, and no warrant shall be issued in payment of any amount due thereon." R.C. 5705.41(D)(1). The purpose of the fiscal certificate " 'is clearly to prevent fraud and the reckless expenditure of public funds.' " *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 49, quoting *State v. Kuhner*, 107 Ohio St. 406, 413, 140 N.E. 344 (1923).

{¶ 33} R.C. 5705.412 operates similarly but applies only to school districts. As applicable in 1997, it stated:

> Notwithstanding section 5705.41 of the Revised Code, no school district shall adopt any appropriation measure, make any contract, give any order involving the expenditure of money, or increase during any school year any wage or salary schedule unless there is attached thereto a certificate signed by the treasurer and president of the board of education and the superintendent that the school district has in effect for the remainder of the fiscal year and the succeeding fiscal year the authorization to levy taxes * * * which, when combined with the estimated revenue from all other sources available to the district at the time of certification, are sufficient to provide the operating revenues necessary to enable the district to operate an adequate educational program * * * for the current fiscal year and * * * the succeeding fiscal year.

Former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, 1272, 1288-1289.

{¶ 34} A contract to which R.C. 5705.412 applies but that does not contain the required certification "shall be void, and no payment of any amount due thereon shall be made." *Id.* The Eighth District has opined, "Clearly, it was the legislative

intent that R.C. 5705.412 should * * * hold school officials to a higher degree of responsibility in expending public funds than other public officials." *CADO Business Sys. of Ohio, Inc. v. Cleveland City School Dist. Bd. of Edn.*, 8 Ohio App.3d 385, 389, 457 N.E.2d 939 (8th Dist.1983).

{¶ 35} In *Tri-County N. Local School Bd. of Edn. v. McGuire & Shook Corp.*, 748 F.Supp. 541 (S.D.Ohio 1989), the United States District Court for the Southern District of Ohio undertook an extensive historical review of R.C. 5705.41 and 5705.412. It traced the genesis of the two statutes to 1874,

> when the Ohio legislature passed what is known as the Worthington law, which provided that the city of Cincinnati could borrow $1 million to rid itself of a debt in a proportion similar to that which the city had incurred by contracting for debts and making appropriations in greater amounts than the city could afford. *Emmert v. Elyria*, 74 Ohio St. 185, 193, 78 N.E. 269 (1906). The Worthington law supplemented a similar provision in the state municipal code, also enacted in 1874, which provided that the City Council of Cincinnati was prohibited from "making appropriations or contracting for debts for the *ordinary purposes of the city, exceeding the amount of taxes and revenues from other sources for the current year*." *State, ex rel Seiter v. Hoffman*, 25 Ohio St. 328, 333 (1874) (emphasis in the original).

*Id.* at 545.

{¶ 36} Two years later, the legislature enacted the Burns Law, which extended application of the 1874 law to all Ohio municipalities. *See id.* at 546.

{¶ 37} In 1934, this court described the Burns Law, in its various forms, as serving the "useful and salutary purpose [of] curtailing the unwise and reckless

14

expenditure of public funds when such funds were not on hand or in sight." *Mayfield Hts. v. Irish*, 128 Ohio St. 329, 332, 191 N.E. 129 (1934). "[T]he clear intent of the Ohio legislature in enacting the Burns law was to prevent municipalities in Ohio from incurring debt problems * * * as a result of contracting for debts in greater amounts than the city could finance from its present tax revenues." *Tri-County* at 546. The *Tri-County* court described R.C. 5705.41 and 5705.412 as being among the various forms the Burns Law has taken in Ohio statutes since its enactment more than a century ago. *Id.*

{¶ 38} R.C. 5705.41(D)(1) qualifies a political subdivision's authority to "make any contract * * * involving the expenditure of money" by requiring it to attach to any such contract a fiscal certificate. In this case, the Eighth District held that the parties' agreement was not subject to that requirement, because the agreement did not involve an expenditure of money. It reasoned that the agreement "provide[d] for the sharing of tax revenue: obtaining funds, not spending funds." 2020-Ohio-4459, 158 N.E.3d 906, at ¶ 51. It explained, "The collection of tax revenue is used to cover the expenditure of funds; it is not an expenditure itself." *Id.*

{¶ 39} Warrensville Heights contends that the court of appeals incorrectly, and too narrowly, construed the term "expenditure." It maintains that the agreement necessarily involved an expenditure of funds because Beachwood would benefit monetarily from its enforcement. In support of its broad understanding of "expenditure," Warrensville Heights unpersuasively cites unrelated statutes that define the term elsewhere in the Revised Code. But those definitions do not apply to R.C. Chapter 5705, which does not define "expenditure."

{¶ 40} This court has held that R.C. 5705.41 applies to contracts that require a political subdivision *to spend* public money. *St. Marys*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, at ¶ 49. That holding is consistent with the ordinary meaning of "expenditure" as "the act or process of expending" and

"something that is expended **:** disbursement, expense," *Webster's Third New International Dictionary* 800; *see also Black's Law Dictionary* 723 (11th Ed.2019) (defining "expenditure" as "[t]he act or process of spending or using money" or "[a] sum paid out").

**{¶ 41}** The parties' agreement does not require Warrensville Heights to expend money; it simply allocates the collectable tax revenue between the two districts. To "collect" is the opposite of to "expend." *See* https://www.thesaurus.com/browse/expend (accessed Apr. 20, 2022) [https://perma.cc/K9ZX-84LX]. Warrensville Heights's agreement that it would be entitled to collect only 70 percent of the tax revenue generated from relevant portions of the Chagrin Highlands territory does not establish that it would be required to expend the other 30 percent, which is to be diverted to Beachwood. The plain language of the agreement reveals an effort to remove any obligation for Warrensville Heights to make direct payments to Beachwood, as well as the parties' anticipation that the county treasurer would pay the agreed-on percentages of the tax revenue directly to the two districts. Although the agreement does describe a process by which Warrensville Heights would transfer collected tax revenue to Beachwood, that process is to apply only if the county auditor or treasurer refuses to make the agreed-on distributions. The Eighth District correctly characterized the agreement as concerning the collection of revenue, not an expenditure of revenue, even if the tax revenue earmarked for Beachwood first passes through Warrensville Heights's treasury as an intermediary on its way to its rightful recipient. Because the agreement does not involve an expenditure of money, it is not subject to R.C. 5705.41(D)(1).

**{¶ 42}** Warrensville Heights next argues that even if the agreement is not subject to R.C. 5705.41, it is unenforceable because it did not comply with R.C. 5705.412. The Eighth District concluded that R.C. 5705.412 is inapplicable based

on its determination that R.C. 5705.412, like R.C. 5705.41, applies only to agreements that require an expenditure of money.

{¶ 43} Warrensville Heights maintains that the applicable version of R.C. 5705.412 required the attachment of a fiscal certificate when a school district " 'ma[d]e *any* contract,' " whether or not the contract called for an expenditure of funds. (Emphasis and brackets added.) Warrensville Heights's brief, quoting former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, at 1288. "Read naturally, the word 'any' has an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). For example, in *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 220, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008), the Supreme Court read "any" in a statutory reference to "any other law enforcement officer" as naturally meaning "law enforcement officers of whatever kind." But it also noted that "other circumstances may counteract the effect of expansive modifiers," like "any." *Id.* at fn. 4.

{¶ 44} To determine the scope of R.C. 5705.412, we must read the statutory language in context. *See Mahoning Educational Assn. of Dev. Disabilities*, 137 Ohio St.3d 257, 2013-Ohio-4654, 998 N.E.2d 1124, at ¶ 15; *United States v. Alvarez-Sanchez*, 511 U.S. 350, 357, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) ("We believe respondent errs in placing dispositive weight on the broad statutory reference to 'any' law enforcement officer or agency without considering the rest of the statute").

{¶ 45} The context here supports the Eighth District's reading of R.C. 5705.412 as applying only to contracts that involve an expenditure of money. First, consistent with the purpose of preventing political subdivisions from incurring debt beyond their ordinary sources of revenue, the certification required under R.C. 5705.412 addresses a school district's ability to satisfy its financial commitments while maintaining an adequate educational program. The consequence for failing to attach a fiscal certificate when required under R.C. 5705.412 is that the contract

"shall be void, and *no payment of any amount due thereon shall be made*."
(Emphasis added.)  This emphasis on rejecting a duty to pay suggests that R.C.
5705.412 addresses contracts that require a payment of money.  Indeed, this reading
of the phrase "make any contract" in former R.C. 5705.412 aligns with the other
actions that the statute prohibits a school district from doing without first obtaining
a fiscal certificate.  Each of those other actions—"adopt[ing] any appropriation
measure," "giv[ing] any order involving the expenditure of money," and
"increas[ing] during any school year any wage or salary schedule," former R.C.
5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, at 1288—involves a
commitment to spend money.

{¶ 46} Although not binding on this court, the federal district court's
reasoning in *Tri-County* undercuts Warrensville Heights's argument that former
R.C. 5705.412 applies, without limitation, to *every* contract made by a school
district.  The school board in *Tri-County* contracted with the McGuire & Shook
Corporation and one of its employees to assess the school district's needs with
respect to the construction of new school facilities.  Funds to pay McGuire & Shook
were to be drawn from the proceeds of a bond issue and funds received from the
State School Building Assistance Fund, all of which were kept separate from other
school-district funds.  The district court held that a R.C. 5705.412 fiscal certificate
was not required, even though the contract undisputedly required the school district
to expend funds, because the funds to satisfy the district's contractual obligations
were not to come from the district's ordinary operating revenue.  It relied on the
fact that R.C. 5705.412 does not contain the following language that is in R.C.
5705.41: " '[m]oney to be derived from the lawfully authorized bonds sold and in
the process of delivery shall for the purpose of this section be deemed in the treasury
and in the appropriate fund.' " *Tri-County*, 748 F.Supp. at 548, quoting a former
version of R.C. 5705.41 (similar language is contained in subsection (E) of the
current version of R.C. 5705.41).  The court reasoned from the absence of that

18

language in R.C. 5705.412 that "the Ohio legislature intended to omit the requirement of certification on contracts by school boards, where the funds to pay for same would come from bond levy proceeds which would not disturb the operating revenues of the school district." *Tri-County* at 549. Under those circumstances, it stated, "certification would neither be relevant nor necessary." *Id.* at 550.

**{¶ 47}** Although for different reasons than those in *Tri-County*, certification under former R.C. 5705.412 was likewise neither relevant nor necessary here. When applicable, former R.C. 5705.412 requires certification that

> the school district has in effect for the remainder of the fiscal year and the succeeding fiscal year the authorization to levy taxes * * * which, when combined with the estimated revenue from all other sources * * *, are sufficient to provide the operating revenues necessary to enable the district to operate an adequate education program for * * * the current fiscal year and * * * the succeeding fiscal year.

Sub.S.B. No. 257, 143 Ohio Laws, Part I, at 1288-1289.

**{¶ 48}** The information contained in a fiscal certificate has no relevance to a contract that does not require the school district to spend money; thus, it would make no sense to read the statute to require a school district to attach a fiscal certificate in those circumstances. What would be the point of a fiscal certificate, for example, if a school district contracts to place an advertisement for a local pizza shop on its football stadium in exchange for a payment of money? Notably, no Ohio appellate court has applied R.C. 5705.412 to invalidate a contractual obligation that did not call for an expenditure of money. Moreover, neither party here has suggested that when the parties executed their agreement in 1997, the

agreement had the potential to affect Warrensville Heights's revenue stream or its ability to operate an adequate educational program in the current or succeeding fiscal year. The revenue-sharing arrangement was to take effect when the cumulative value of properties within the Chagrin Highlands territory exceeded an agreed-on threshold value, and Beachwood has not claimed that it was entitled to tax revenue for any year prior to 2012—many years after the parties executed their agreement. Again, the information that is statutorily required in a fiscal certificate is irrelevant to the circumstances presented by the parties' agreement.

{¶ 49} For these reasons, we conclude that neither former R.C. 5705.41 nor former R.C. 5705.412 required that the parties' agreement contain a fiscal certificate.

### *This court will not decide the applicability of political-subdivision immunity in the first instance*

{¶ 50} Having concluded that the 1997 agreement between Warrensville Heights and Beachwood is valid and enforceable, we now turn to Warrensville Heights's final proposition of law, which relates to Beachwood's claims for promissory estoppel, unjust enrichment, fraud, and conversion. Warrensville Heights maintains that the court of appeals erred by reversing the trial court's dismissal of those claims, and it asks this court to hold that R.C. Chapter 2744 cloaks it with immunity for tort claims arising out of the negotiated agreement to share tax revenue.

{¶ 51} In its motion for summary judgment, Warrensville Heights argued that it was entitled to judgment as a matter of law on Beachwood's promissory-estoppel, unjust-enrichment, conversion, and fraud claims, in part because it was immune from liability under R.C. Chapter 2744. But neither the trial court nor the court of appeals addressed the merits of Warrensville Heights's immunity claim. After concluding that the parties lacked authority to contract without the state board's approval, the trial court stated only, "[T]he court finds no valid contract

was formed and [Beachwood's] remaining counts for promissory estoppel, unjust enrichment, conversion, and fraud fail." Then, the court of appeals stated that the sole issue on appeal was whether the parties' agreement was valid and enforceable. By concluding that the agreement was enforceable, the court rejected the sole basis for the trial court's entry of summary judgment on Beachwood's noncontract claims. It therefore reversed that judgment and remanded the matter for the trial court to adjudicate those claims. Because neither the trial court nor the court of appeals has conducted any analysis of Warrensville Heights's immunity argument, we decline to do so for the first time here. Those are issues for the trial court to determine on remand.

### Conclusion

{¶ 52} The 1997 agreement to share tax revenue in lieu of a transfer of the Chagrin Highlands territory from the Warrensville Heights City School District to the Beachwood City School District—an agreement unanimously adopted by both school boards—required neither approval from the state board of education pursuant to R.C. 3311.06 nor a fiscal certificate under either former R.C. 5705.41 or former R.C. 5705.412. We therefore affirm the judgment of the Eighth District Court of Appeals, and we remand this matter to the Cuyahoga County Court of Common Pleas for further proceedings consistent with this opinion.

Judgment affirmed

and cause remanded to the trial court.

KENNEDY, DEWINE, and DONNELLY, JJ., concur.

FISCHER, J., dissents, with an opinion.

STEWART, J., dissents, with an opinion joined by BRUNNER, J.

_____

**FISCHER, J., dissenting.**

{¶ 53} I respectfully dissent. I agree with the majority opinion that the plain language of former R.C. 3311.06 requires an actual transfer of school-district territory for the statute to apply. However, I disagree with the majority opinion's interpretation of former R.C. 5705.412 and its conclusion that former R.C. 5705.412 does not apply to this case because the statute governs only school-district contracts that involve an expenditure. I would hold that former R.C. 5705.412 governs any contract entered into by school districts, especially those involving money, and that an expenditure under the contract is not required for the statute to apply. Therefore, I would hold that former R.C. 5705.412 applies to the contract between appellant, Warrensville Heights City School District Board of Education ("Warrenville Heights"), and appellee, Beachwood City School District Board of Education ("Beachwood"). Additionally, I would conclude that the contract between the parties is void pursuant to former R.C. 5705.412 because of the parties' failure to include the required fiscal certificate.

## Former R.C. 5705.412 is unambiguous and applies to any contract entered into by a school district

{¶ 54} In upholding the contract between Warrensville Heights and Beachwood, the majority opinion determines that former R.C. 5705.412 does not apply in this case because the statute applies only to school board contracts that involve an expenditure of money. But for the majority opinion to reach this conclusion, it inserts words into the statute and construes the statute in a manner that is contrary to its plain language.

{¶ 55} We look to the plain language of a statute to determine the legislature's intent. *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 9. In reviewing the statute, we must give effect to the statutory language without deleting or inserting words. *Bailey v. Republic Engineered Steels, Inc.*, 91 Ohio St.3d 38, 39-40, 741 N.E.2d 121 (2001), citing *Provident Bank v. Wood*, 36

22

Ohio St.2d 101, 105, 304 N.E.2d 378 (1973), and *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 524 N.E.2d 441 (1988), paragraph three of the syllabus. And only when the statute is ambiguous do we look to legislative history and other factors to provide guidance. *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16.

{¶ 56} Former R.C. 5705.412 is unambiguous. A school district shall not (1) "adopt any appropriation measure," (2) "*make any contract*," (3) give any order involving the expenditure of money," or (4) "increase during any school year any wage or salary schedule" without attaching a certificate signed by the treasurer and board of education. (Emphasis added.) Former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, 1272, 1288. The phrase "make any contract" is broad and is not limited by any language requiring that the contract involve an expenditure or by any other language. Simply put, "any" means any. *Watkins v. Dept. of Youth Servs.*, 143 Ohio St.3d 477, 2015-Ohio-1776, 39 N.E.3d 1207, ¶ 16. Therefore, because the contract between Warrensville Heights and Beachwood is a contract between two school districts, it plainly falls under former R.C. 5705.412.

{¶ 57} The majority opinion ignores the word "any" and inserts words into the statute that are not there. And not only does the majority opinion insert words into the statute, but it inserts words that the General Assembly expressly included in one item in the list of items at issue here and excluded from another item in that list. The interpretive canon expressio unius est exclusio alterius is instructive.

{¶ 58} " '[T]he canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an "associated group or series," justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.' " (Brackets sic.) *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 35, quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003), citing *United States v. Vonn*, 535 U.S. 55, 65,

122 S.Ct. 1043, 152 L.Ed.2d 90 (2002).  As the Supreme Court of the United States has explained in regard to the canon:

> Just as statutory language suggesting exclusiveness is missing, so is that essential extrastatutory ingredient of an expression-exclusion demonstration, the series of terms from which an omission bespeaks a negative implication.  The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.

*Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 81, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002).

{¶ 59} Here, we have a list of four actions that were valid only if a school district first obtained a fiscal certificate.  The General Assembly forbade the school district from "mak[ing] any contract" and "giv[ing] any order *involving the expenditure of money*" without the required fiscal certificate.  (Emphasis added.) Former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, at 1288.  The General Assembly's inclusion of the expenditure language to limit one action, giving an order, but not the other action, making a contract, "support[s] a sensible inference that the term left out must have been meant to be excluded," *see Chevron U.S.A., Inc.* at 81; *see also League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 167 Ohio St.3d 255, 2022-Ohio-65, 192 N.E.3d___, ¶ 286 (Fischer, J., dissenting).  It logically follows that the Generally Assembly intended to limit only the scope of orders, not contracts, to those that involve expenditures of money.  The phrase "make any contract" is quite clear—it means "make any contract."  The phrase does not limit the statute's applicability to contracts that involve an

expenditure of money—such limiting language is plainly absent. Thus, the canon of statutory construction *expressio unius est exclusio alterius* supports the conclusion that former R.C. 5705.412 applies to the contract in this case.

{¶ 60} Even if the phrase is read as "make *a* contract" instead of "make *any* contract," in context with the rest of former R.C. 5705.412, the phrase cannot be construed as narrowly as the majority opinion construes it in this case. It is true that the other actions that require fiscal certificates, "adopt any appropriation measure," "give any order involving the expenditure of money," and "increase during any school year any wage or salary schedule" necessarily involve spending funds. But all these actions may be taken only after attaching a fiscal certificate that guarantees that the school district has the money, through levies and "revenue from all other sources available to the district," to support the action taken. Former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I, at 1288-1289. Sure, that requirement implies that the four actions likely involve spending money. But the requirement may also involve actions that would limit the revenue stream that the school district receives. Money is clearly the focus in former R.C. 5705.412, but whether that focus involves only spending money or whether it also involves making money and reallocating money is up for debate. At best, the statute required that the contract involve the management of money, not merely the expenditure of money.

{¶ 61} Because the plain language of former R.C. 5705.412 applies to "any contract" made by a school district and the contract between Warrensville Heights and Beachwood involves the management of money in the form of reallocating and disbursing tax revenues belonging to Warrensville Heights City School District to another school district, I would conclude that former R.C. 5705.412 applies in this case and that a certificate as described in the statute was necessary for the contract to be valid. *See* former R.C. 5705.412, Sub.S.B. No. 257, 143 Ohio Laws, Part I,

at 1288-1289 (a school-district contract that is subject to the statute is void if it does not contain the required fiscal certificate).

**Though obtaining a fiscal certificate in this circumstance might have been difficult, that does not mean that one was not required**

{¶ 62} Beachwood argues that obtaining a certificate described in former R.C. 5705.412 would have been nearly impossible, but this perceived difficulty does not negate the plain language of the statute. One could argue that this perceived difficulty illustrates that former R.C. 5705.412 does not apply. But while there may be that one undesirable consequence of this plain-language interpretation, that consequence might be outweighed by other policy considerations, such as requiring oversight of the school districts' management of financial resources and encouraging transparency. And given the General Assembly's clear intent to have the state board of education oversee the transfers of annexed territory between school districts, *see* former R.C. 3311.06, Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3341, 3641, and to ensure that money is managed appropriately by the school districts, *see* former R.C. 5705.41 and 5705.412, it seems rather odd for the General Assembly to have left such a large loophole for school districts to engage in the negotiation of tax revenues, educational benefits, and other matters with unfettered discretion and zero regulation.

**Conclusion**

{¶ 63} Former R.C. 5705.412 applies to the contract between Warrensville Heights and Beachwood that required Beachwood to forgo transfer of the annexed territory to its district in exchange for Warrensville Heights's agreement to share the tax revenue from the annexed territory with Beachwood City School District. But because there was no fiscal certificate, under former R.C. 5705.412, that contract between Warrensville Heights and Beachwood is void. Because the

majority opinion does not apply this statute and remands the cause for the trial court to review the void contract, I respectfully dissent.

_____

**STEWART, J., dissenting.**

**{¶ 64}** R.C. 3311.06 is a remedial statute. When the meanings of the terms in a remedial statute are in dispute, as they are here, those terms must be interpreted liberally to effectuate the statute's objective. *See* R.C. 1.11. The remedial objective of R.C. 3311.06 is to protect the educational interests of school-age children residing in a school district that has had part of its territory annexed to a city for municipal purposes when there is an attempt to transfer that territory to a school district associated with the annexing municipality. The statute realizes this goal by requiring that the affected school districts' boards of education follow certain delineated procedures when a transfer request has been made and by requiring that the state board of education oversee the transfer-request process. Because the entire purpose of R.C. 3311.06 is to protect schoolchildren's educational interests, R.C. 3311.06 necessarily requires state-board approval of a transfer of tax-revenue funds flowing from a school district's request to transfer annexed territory, even if no transfer of territory occurs. Any other interpretation of the statute has the potential of harming children's educational interests by permitting the diversion of tax-revenue funds to another school district, without any neutral and detached oversight from the state board of education. Accordingly, I dissent.

**R.C. 3311.06 must be liberally construed to effectuate its purpose**

**{¶ 65}** A remedial statute is designed to correct an existing law, redress an existing grievance, or introduce regulations conducive to the public good. 50 American Jurisprudence, Statutes, Section 15, at 34 (1944). Remedial laws also include laws that are procedural in nature. *State ex rel. Slaughter v. Indus. Comm.*, 132 Ohio St. 537, 543-544, 9 N.E.2d 505 (1937), quoting *Miami Cty. v. Dayton*, 92 Ohio St. 215, 219, 110 N.E. 726 (1915) (" 'A statute undertaking to provide a rule

of practice, a course of procedure, or a method of review, is in its very nature and essence a remedial statute' "). Importantly, the Ohio General Assembly has made clear that "[r]emedial laws and all proceedings under them shall be liberally construed in order to promote their object and assist the parties in obtaining justice." R.C. 1.11.

{¶ 66} There can be no doubt that R.C. 3311.06 is a remedial law, as it delineates the procedures for requesting and obtaining a transfer of school-district territory and the related division of funds. But the statute is also remedial because it is designed to protect the educational interests of schoolchildren affected by a transfer of territory or funds. This design can be seen in R.C. 3311.06(C)(2), which requires, now and as it existed in 1997 when the agreement between the school boards was executed, that a school district seeking transfer of annexed territory engage in good-faith negotiations over the terms of the transfer with the school district subject to losing territory. It can also be seen in R.C. 3311.06(D), which requires, as it did in 1997, that the state board of education adopt specific rules governing the negotiations that will encourage the realization of the following goals: (1) a discussion by the districts of the educational needs of the students in each district, (2) the educational, financial, and territorial stability of each district, and (3) the assurance of appropriate educational programs, services, and opportunities for the students in each district. Indeed, this court has acknowledged the remedial nature of R.C. 3311.06 in the past, when it indicated that there was solid ground in the Ohio Constitution for the following statement:

> "The entire legislation regulating school districts, and especially that part regulating the establishment of public school districts in territory annexed to a city, is indeed remedial. * * * *The entire matter is subject to legislative control*; and legislation treating these

28

problems is remedial in the sense that *it is directed solely to the advancement of the public welfare*."

(Emphasis added.) *State ex rel. Worthington Exempted School Dist. Bd. of Edn. v. Columbus City School Dist. Bd. of Edn.*, 172 Ohio St. 237, 239-240, 175 N.E.2d 91 (1961), quoting *Bohley v. Patry*, 107 Ohio App. 345, 348-349, 159 N.E.2d 252 (9th Dist.1958).

{¶ 67} Because R.C. 3311.06 is remedial in nature, if it is ambiguous, this court must interpret it liberally to effectuate its purpose. And in this case, the phrase "incident []to" is ambiguous.

{¶ 68} As we have previously explained:

> To determine the plain meaning of a statute, a court relies on the definitions provided by the legislative body, because a "definition by the average man or even by the ordinary dictionary with its studied enumeration of subtle shades of meaning is not a substitute for the definition set before us by the lawmakers with instructions to apply it to the exclusion of all others." *Fox v. Std. Oil Co. of New Jersey*, 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780 (1935). When a term is not defined in the statute, we use the term's plain and ordinary meaning. *Brecksville v. Cook*, 75 Ohio St.3d 53, 56, 661 N.E.2d 706 (1996). And "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.C. 1811, 100 L.Ed.2d 313 (1988).

*State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, 170 N.E.3d 842, ¶ 18. As with statutory terms, the terms in administrative rules are also to be given their plain and ordinary meaning. *State ex rel. Richmond v. Indus. Comm.*, 139 Ohio St.3d 157, 2014-Ohio-1604, 10 N.E.3d 683, ¶ 28.

{¶ 69} The majority opinion holds that R.C. 3311.06, as it existed in 1997, required state-board approval of tax-revenue sharing only when one school district's territory was *actually* transferred to another school district. The majority reaches this conclusion primarily by turning to a dictionary to define the term "incident," since it is not defined in the statute. However, in relying on its dictionary definition of "incident," the majority ignores other important aspects of R.C. 3311.06 and its corresponding administrative regulations that indicate that the phrase "incident []to" involves not only situations in which an actual transfer of property occurred but also situations in which there was an initiation of a request to transfer property. Compare, for example, R.C. 3311.06(G) and (I). The first sentence of R.C. 3311.06(G) states:

> In the event territory is transferred from one school district to another under this section, an equitable division of the funds and indebtedness between the districts involved shall be made under the supervision of the state board of education and that board's decision shall be final.

This sentence makes clear that when there is an actual transfer of territory there necessarily will be an accompanying division of funds and indebtedness between the districts and that this process must be overseen by the state board. On the other hand, R.C. 3311.06(I) states that "[n]o transfer of school district territory *or* division of funds and indebtedness incident thereto, pursuant to the annexation of territory to a city or village shall be completed in any other manner than that

prescribed by this section." (Emphasis added.) It makes little sense for the legislature to use the disjunctive word "or" in R.C. 3311.06(I) when an equitable division of funds and indebtedness is already an inevitable aspect of a transfer of territory, *see* R.C. 3311.06(G), unless "incident []to" contemplates agreements resulting in division of funds and indebtedness that exist outside of an actual transfer of territory. If "incident []to" means only with regard to a transfer of territory, then the legislature would have simply used the conjunctive word "and" in R.C. 3311.06(I).

{¶ 70} Similarly, it is clear from the administrative regulations corresponding to R.C. 3311.06 that the statute does not contemplate only transfers that are a fait accompli. The administrative-code sections, for example, apply to "request[s]" and "petition[s]" to transfer as well as consummated transfers. Ohio Adm.Code 3301-89-01(A). Such requests or petitions, as well as any eventual agreement on the matters in question, are to be sent to the state board of education, "with reasonable dispatch," for the state board's review and determination whether negotiations were held in good faith. Ohio Adm.Code 3301-89-01(D). Moreover, the agreement in this case included provisions regarding (1) tax-revenue sharing, (2) the period of time during which no revenue sharing would take place as the annexed territory increased in value, and (3) cooperative programs between the districts. Those terms are exactly the same terms contemplated as agreement terms under the administrative rules corresponding to R.C. 3311.06. Ohio Adm.Code 3301-89-04(C)(1), (2), and (4). Thus, the statutory scheme of R.C. 3311.06 and the regulatory scheme corresponding to the statute are broad enough to encompass both actual transfers and attempts to transfer territory brought about by the filing of a request to transfer with the state board and should be interpreted as such to effectuate the statute's remedial purpose of protecting the educational interests of school-age children.

{¶ 71} With regard to R.C. 3311.06's goal of protecting the educational interests of children, it is also useful to compare what a district-territory-transfer agreement is meant to accomplish and what the agreement in this case accomplishes. The agreement requires the Beachwood City School District to cease and desist all attempts to transfer the territory to its district. However, the agreement also requires Warrensville Heights City School District to share tax revenue from the annexed territory with the Beachwood City School District. And although the agreement does not require the Beachwood City School District to offer full enrollment to children within the annexed territory, the agreement does require Beachwood to cooperate in "joint educational programs and activities which will be of benefit to both School Districts." These two aspects of the agreement embody the same important matters that require state-board oversight and approval when there is a transfer of territory—a change of tax-revenue and educational-service obligations—and are specifically contemplated as terms of a transfer agreement in Ohio Adm.Code 3301-89-04(C)(1) and (2). Moreover, the agreement includes no termination date and provides that it may be terminated only by written agreement of both parties. In short, although the agreement does not transfer school-district territory, the agreement accomplishes the same types of perpetual changes to essential aspects of the districts' educational systems that would occur with a transfer of territory. The majority opinion's interpretation of the statute allows these important and perpetual changes to happen without any neutral and detached oversight from the state board of education, even though the majority acknowledges that these changes would have required state-board approval had territory actually transferred. Furthermore, the majority opinion's interpretation of the statute allows it to be used in a way that was never intended— as a carrot-and-stick method of negotiation whereby one school district can take advantage of another by filing an application to transfer territory solely as a means of inducing or forcing another school district into a settlement that results in the

withdrawal of the application. It is easy to see how a school district subject to losing its territory may enter into a settlement agreement simply to *guarantee* that no transfer of territory occurs, even if that agreement is highly unfavorable to the school district and its students and thus would not have been approved by the state board. As the dissenting opinion in the court of appeals aptly notes, such an interpretation allows "a school district to petition for annexation to induce the affected district to enter into an agreement that does not comply with the legislative intent and statutory purposes, policies, and history and does not protect the welfare of the students." 2020-Ohio-4459, 158 N.E.3d 906, ¶ 95 (Laster Mays, J., dissenting).

**{¶ 72}** Had the state board reviewed this matter, it would have done so "with primary consideration given to the present and ultimate good of the pupils in the affected districts." Ohio Adm.Code 3301-89-01(F); *Bartchy v. State Bd. of Edn.,* 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 45 (plurality opinion) (noting that Ohio Adm.Code 3301-89-01 sets forth the general policies of the state board regarding requests for territory transfers, including that the primary merit consideration is the good of the pupils involved). In reviewing the language of R.C. 3311.06 and its related regulatory scheme, it seems apparent that the state board should have had an opportunity to consider the terms of the agreement at issue in this case and approve or disapprove it accordingly. For the foregoing reasons, I would reverse the judgment of the court of appeals and hold that the agreement between the school districts is not valid as it was not formed in compliance with R.C. 3311.06.

BRUNNER, J., concurs in the foregoing opinion.

————————————

Reminger Co., L.P.A., Holly Marie Wilson, Brian D. Sullivan, and Aaren R. Host; and Brindza McIntyre & Seed, L.L.P., and Daniel McIntyre, for appellee.

Pepple & Waggoner, Ltd., Christian M. Williams, Donna M. Andrew, and Brian J. DeSantis; and Taft Stettinius & Hollister, L.L.P., Thomas J. Lee, Adrian D. Thompson, Aaron M. Herzig, and Brian A. Morris, for appellant.

_____